## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| JASON WESTERFIELD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 07 C 3518 |
| | ) | |
| LEE LUCAS, et al. | ) | Judge Gaughan |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF JASON WESTERFIELD'S RESPONSE TO
DEFENDANT LEE LUCAS' MOTION FOR SUMMARY JUDGMENT**

Now comes Plaintiff, JASON WESTERFIELD, by his counsel, LOEVY & LOEVY, and respectfully responds in opposition to Defendant Lee Lucas's motion to dismiss or for summary judgment as follows:

### Statement of the Issues

This case comes before the Court on defendant Lucas's pre-discovery[1] Rule 12(b)(6) motion to dismiss or, in the alternative, for summary judgment. In the motion, Lucas does not dispute that crediting the allegations in the complaint, plaintiffs state claims upon which relief can be granted. Instead, Lucas argues that certain facts he delineates in his motion establish that he had sufficient probable cause at the relevant time period, so he is entitled to qualified immunity for any allegations relating to a wrongful arrest or search. Lucas does not address the remaining allegations in the complaint directly, except to suggest that those claims are no longer viable after his criminal trial.

---

[1] As the Court is aware, following an appeal to the Sixth Circuit, limited discovery with respect to qualified immunity was ordered. However, discovery was limited to 20 interrogatories to each Defendant regarding their purported qualified immunity defense. With one exception, Officer Ansari, none of the defendants have been deposed, produced documents, or even made initial disclosures. Discovery has scarcely begun.

**Summary of the Argument**

Lucas does not contest as a legal matter, that if the allegations in plaintiffs' complaint are credited, the complaint states claims upon which relief can be granted, so Lucas is not entitled to dismissal under Rule 12(b)(6).  Despite filing this motion under Rule 12(b)(6), defendant's motion is in substance a pre-mature summary judgment motion, without the evidence. It fails as either type of motion. As set forth below, there are abundant facts establishing that Lucas is not entitled to qualified immunity for his egregious violations of Jason Westerfield's clearly established constitutional rights, and that dispute of facts precludes summary judgment.

The evidence from defendant Lucas's criminal trial creates an unmistakable dispute of fact about whether Lucas was aware that his purported confidential informant, Jerrell Bray, was intentionally framing innocent people and whether Lucas played a pivotal role in the frame-up conspiracy by overlooking blatantly obvious frame-ups, altering DEA reports and transcripts to enable the frame-ups to succeed, testifying falsely, failing to include exonerating information in his reports, failing to pass on exonerating information to the prosecutors, and sitting silently at the prosecution's table during the frame-up victims' criminal trials, with the knowledge that other witnesses were testifying falsely. There is powerful evidence showing that Lucas worked very hard to keep prosecutors and counsel for the accused unaware of the proof of the frame-ups and unaware that Bray was stealing from the DEA, cheating, and dealing his own drugs while framing innocents. The evidence also establishes that the probable cause Lucas purports to rely on is premised on his own false testimony and manufactured evidence.

Lucas is not entitled to qualified immunity for violating Westerfield's clearly established constitutional rights in that manner nor for the countless *Brady* violations he perpetrated, and summary dismissal and/or judgment must therefore be denied.

## I.     STATEMENT OF FACTS

On March 16, 2006, a superseding indictment was filed against twenty-two individuals for crimes allegedly committed in the Mansfield, Ohio area between February 2004 and November 2005. (See Appendix Ex. 8). With few exceptions, the crimes charged related to alleged drug sales to the defendants' confidential informant, Jerrell Bray. It has now come to light that Bray was framing innocent people with abandon, and he has since pled guilty to violating the civil rights of several of the conspiracy's victims. (App. ¶ 95). Bray is currently in custody for his role in framing people for drug crimes. (App. ¶ 95).

After Bray's lies came to light, the government filed a motion seeking to allow the conspiracy victims who pled guilty to withdraw their pleas and to dismiss the charges against them. (App. ¶ 96). In that motion, the government argued that "Bray's illegal conduct was so pervasive and his credibility so tainted" that those charged based on his testimony should be permitted to withdraw their guilty pleas. (App. ¶ 96). The government noted that after those pleas are withdrawn, Bray remains an essential witness who is not reliable or credible, so the charges should all be dismissed. (App. ¶ 96). At prosecutors' requests, federal judges have now freed everyone who pled guilty to any alleged drug deal involving Bray. (App. ¶ 97).

Jason Westerfield was charged along with twenty-one others in a superseding indictment. Westerfield was charged with eight drug offenses: two each related to alleged transactions with Jerrell Bray on February 15 and March 12; one related to an alleged transaction with Jerrell Bray on March 15, 2005; two related to an ensuing search of a physical residence on April 25, 2005; and one for conspiracy to possess crack cocaine with intent to distribute between Winter 2004 and November 8, 2005. (App. ¶ 98). After a jury trial, Jason Westerfield was found guilty of only one count of possession of cocaine base (crack) with intent to distribute and was sentenced to 360 months of imprisonment. (Ex. 99).

Defendant Lucas is the DEA agent who worked directly with Bray in a surveillance or undercover capacity during many of the Mansfield frame-ups and who assisted in the prosecution of the conspiracy victims. (App. ¶ 2-4).  According to the investigation report, the officers involved in investigating the alleged sales involving plaintiff included defendants Metcalf, Faith, and Mayer. (App. ¶ 100).

Because no depositions (except Ansari's) have yet been taken and only limited interrogatories, but no other written discovery – not even basic 26(a)(1) disclosures – has been tendered in this matter, there are likely far more facts relevant to defendant Lucas's misconduct that have not yet been uncovered. With that caveat, the evidence unearthed thus far indicates that prior to Jason Westerfield's trial, Lucas had material information that would have severely impeached Bray, himself, and the other investigating officers, but rather than disclose that evidence to the prosecution or plaintiff's defense, Lucas affirmatively hid the evidence through false reporting, altering transcripts, and lying to the prosecutors. There is also evidence that Lucas was part of a larger conspiracy in Mansfield to frame people for drug crimes they did not commit, including framing Jason Westerfield for a drug sale he did not participate in.

### Defendant Lucas Failed to Disclose *Brady* Material

Once he became involved, Lucas's role in this conspiracy permeated every stage and provided the key support so that Bray's lies would go undetected. First of all, Lucas drafted reports about each of the deals Bray was involved with, and those reports (called DEA-6 reports) included false support for charges and omitted exonerating evidence. (App. ¶ 11, 12, 18-20, 26, 28, 30-31, 33, 38, 41, 56, 80, 89). For instance, Bray routinely dialed the identical telephone numbers for unrelated suspects, called one suspect while claiming he had called another, and/or had a different phone encounter from the one described by Bray or detailed in Lucas's report, but Lucas never documented these subterfuges. (App. ¶ 18).  Instead, Lucas actually altered the text

of at least two telephone transcripts to mask inconsistencies between the calls and Bray's claims. (App. ¶ 45-47, 60-61). While much of the false reporting discovered to date occurred in investigations of other individuals, it is evidence that Bray was a false witness, and Lucas was preventing that fact from coming to light.

Lucas worked hard to protect Bray's credibility, despite Bray's blatant cheating, stealing and lying. In furtherance of that goal, Lucas's reports neglected to note obvious discrepancies between the drug weights allegedly transferred by Bray during the deals and the actual weights, which allowed Bray to deal his own drugs or steal money from the DEA without being caught. (App. ¶ 18, 20, 72). When a defendant's proffer revealed that Bray was selling his own drugs on the side, in addition to the buying he was doing for the government, Lucas buried that impeaching fact as well. (App. ¶ 20). Lucas also buried the fact that Bray was caught stealing money from the DEA during a deal. (App. ¶ 12-13). Indeed, Lucas lied to the prosecutor on more than one occasion to cover for Bray. (App. ¶ 36, 39).

Additionally, during the conspiracy to frame innocent Mansfield citizens, Lucas testified falsely against conspiracy victims, suborned perjury, and failed to correct patently false testimony. For example, Lucas testified falsely and/or watched several individuals get prosecuted when it was readily apparent to him that they were wrongly accused. (App. ¶ 21, 23-25, 34-35, 42-44, 51, 56, 62, 63-66, 67-68, 75-76, 83, 87, 91-92). Lucas also sat silently at the prosecutors' table while defendant Metcalf perjured himself during the trial of Danny Brown and his co-defendants (a fact Metcalf now openly admits), and Lucas was aware that Metcalf's testimony was false, but he did nothing to address the perjury. (App. ¶ 32-33, 37). Likewise, although Lucas knew the testimony to be false, he repeatedly sat silently while Bray perjured himself and even backed up Bray's false testimony with false testimony of his own. (App. ¶ 39, 48-50, 81-82,

86). Lucas also knowingly drafted a false search warrant affidavit for Metcalf to sign. (App. ¶ 40).

On May 12, 2009, Lucas was indicted in an eighteen count federal indictment for violating 18 U.S.C. §§ 1503(a) (obstruction of justice), 1001(a)(3) (knowing creation of a false government document), 1623(a) (false testimony and/or creation of a material false declaration), and 242 (deprivation of rights under color of law). (App. ¶ 6). The indictment's allegations all related to Lucas's actions in conjunction with using Jerrell Bray as a duplicitous informant. (App. ¶ 6). After Lucas was indicted, he drafted a memo that he distributed to others, including some of the defendants here. (App. ¶ 10). The memo had false information about Lucas's investigations regarding who saw what and how certain deals were verified, and Lucas now admits that the memo was inaccurate. (App. ¶ 10). Lucas admits that his intention in drafting the memo was to coordinate what the witnesses would say at his trial about the investigations. (App. ¶ 10). The government failed to prove Lucas guilty beyond a reasonable doubt.

### Lucas's Behavior During Specific Drug Buys Establishes His Efforts to Help Bray Frame Innocent People, Including Plaintiff

<u>Danny Lee Brown</u>. In an effort to frame Danny Brown, Bray made two recorded telephone calls to Brown, but Bray was unable to set up a drug deal during either call – in the first Bray left a message and in the second, Brown asked Bray to call him back in twenty minutes. (App. ¶ 53). Phone records show that Bray then tried to call Brown 28 times, but that Brown did not take Bray's calls. (App. ¶ 54). When Brown would not speak to Bray, Bray told the officers that Brown's telephone number was changed to a number that was actually registered to Robert Harris, another target of the investigation. (App. ¶ 55). This pivotal fact was not documented, and the two later calls that the DEA-6 report attributed to Brown were instead readily recognizable as being to Robert Harris. (App. ¶ 56).

During the resulting drug deal, falsely attributed to Danny Brown, Frank Douglas was the courier who delivered the drugs. (App. ¶ 57). The deal took place close to the home of Chris Jordan, Bray's known friend and fellow drug dealer whom Bray worked to keep free of allegations in the Mansfield roundup. (App. ¶ 57-58). Bray's body recording during the deal recorded Bray saying at the end of the buy, "That's cool, that's cool. Here, give that to Chris," which would alert a listener that the money was going to Chris, not Danny Brown. (App. ¶ 60). Because Bray's slip undermined his contention that Danny Brown, not Chris Jordan, was the person behind the drug deal, the copy of the transcript of the body wire prepared by defendants for Danny Brown's trial omitted the statement, "give that to Chris." (App. ¶ 61).

Lucas then gave false testimony during the criminal trial against Brown to bolster Bray's testimony. At his own criminal trial, Lucas testified that during the alleged Brown deal, it was raining so hard that Lucas could not see the drug courier. (App. ¶ 62). But at Brown's criminal trial, Lucas testified that he identified the courier as Frank Douglas. (App. ¶ 62).

Roosevelt Williams. Lucas's misconduct during conspiracy victim Roosevelt Williams' frame-up is evidence of his role in hiding, supporting and enabling Bray's false allegations. Williams has proven with evidence that he was in Chicago when the deal he was accused of participating in happened in Ohio. (App. ¶ 21). Detective Wheeler was very familiar with Williams from well before this deal, having spent hours watching him during surveillance. (App. ¶ 22). According to Wheeler, who was conducting surveillance with Lucas during the deal, even though Roosevelt Williams is tall, thin, and light-skinned with freckles, the person Lucas identified as Williams was short, dark-skinned, and stocky. (App. ¶ 23).

Immediately after the drug deal, detective Wheeler informed Lucas that the suspect Lucas identified as Williams was misidentified. (App. ¶ 24). Ignoring this informed opinion, Lucas

insisted that the identification was correct, and Lucas's report of the buy omitted Wheeler's credible claim that the suspect was not Williams. (App. ¶ 25-26). In order to support Bray's frame-up of Williams, Wheeler's findings were not documented by Lucas, and Wheeler's claim of misidentification was, therefore, never revealed to the defense. (App. 26-27).

In actuality, Robert Harris acted as a "stand-in," impersonating Roosevelt Williams. (App. ¶ 28). Harris also acted as a stand-in during Johnny Robertson's fake drug deal, wearing the same shirt during both deals. (App. ¶ 28). The exonerating fact that the same man wearing the same shirt was identified as both Williams and Robertson was never noted or documented by Lucas in his reports nor disclosed during either's prosecution. (App. ¶ 28).

As if Harris' unlawful impersonation was not obvious enough, during the supposed Williams deal, Lucas saw the drug dealer alleged to be Williams actually arrive in Bray's car – the same car that Lucas previously saw Bray use during the alleged Nabors drug deal. (App. ¶ 29). In fact, during the so-called Williams deal, defendant Ansari ran the license plate of the car driven by the dealer and confirmed that the car was Bray's. (App. ¶ 30). To hide this startling fact, a second DEA-6 report was generated, falsely identifying the make of car driven by the fake drug-dealer. (App. ¶ 30). Additionally, Lucas saw and commented on the fact that the seller not only drove Bray's car, but he drove it back to Bray's house after the purported drug deal. (App. ¶ 31). That important observation was also omitted from Lucas's DEA-6 report. (App. ¶ 31).

<u>Dwayne Nabors</u>. Lucas's false testimony to support the frame-up conspiracy was unmistakable in the fabricated case against Dwayne Nabors. Defendant Metcalf now admits he blatantly lied during Nabors's trial. (App. ¶ 32). Metcalf's fictitious testimony included his false identification of Nabors as a participant in a drug deal. (App. ¶ 32). Metcalf now admits that in truth, he saw Nabors go into Platinum Status (where Nabors worked), and Nabors was not

outside in the car dealing drugs, as Metcalf and Lucas falsely testified. (App. ¶ 32). When questioned about why he testified falsely against Nabors, Metcalf answered, "Because I really thought this is what everybody else was going to testify to. This is what was on paper. . . . Because it had to make sense." (App. ¶ 33). Metcalf explained that he perjured himself "because I regurgitated what [came] off the DEA-6 report." (App. ¶ 33). The DEA-6 report, of course, was full of the false statements that typified Lucas's reports in the Mansfield cases.

Although there is "a vast difference" in the physical appearances of Nabors and the person who admitted to driving the car, Lucas falsely identified Nabors as the driver of the car. (App. ¶ 34-35). In support of their false identification, defendants Lucas and Metcalf lied to the prosecutor Blas Serrano, telling him that there was no video capturing this deal when there was in fact a video taken. (App. ¶ 36). Metcalf then falsely testified that there was no video tape taken of the supposed Nabors deal, and although Lucas sat at the prosecutors' table during this false testimony, he did not alert the prosecutor to Metcalf's lie. (App. ¶ 37).

Lucas's express efforts to falsely bolster Bray's credibility were also readily apparent in the alleged Nabors deal. There, Bray flagrantly stole thousands of dollars from the DEA, an exculpatory fact that goes directly to his credibility, but that Lucas never documented or revealed to any of the conspiracy victims during their prosecutions. (App. ¶ 38). During Nabors' trial, Bray tried to cover up the fact that he was paid for the drugs in part with a Cutlass that he kept for himself (leading to the DEA's shortfall) by falsely testifying that the recorded discussion about a "Cutty" was actually a discussion about Nabors' "Caddy" (Cadillac). (App. ¶ 39). When a prosecutor angrily confronted Bray about his obviously false explanation, Lucas stepped up to cover up Bray's false explanation by telling the prosecutor that "Cutty" was another word for "dope." (*Id.*). Lucas never told anyone that he was lying about that.

Lowesco Ballard. Lucas's role in the frame-up conspiracy is also demonstrated by evidence from the Ballard case. Lucas saw the same stand-in, Darren Transou, impersonate both Noel Mott and Ballard in two separate drug deals. (App. ¶ 42). The obviousness of this ruse was augmented by the fact that Transou looked nothing at all like Ballard, who Lucas saw during the prosecution. (App. ¶ 4, 43). Lucas testified that he looked at a picture of Darren Transou to rule him out before (falsely) identifying Ballard. (App. ¶ 44). But, defendant Cross did not actually order the identification picture of Transou for the DEA file until more than a year after Lucas's false identification, so Lucas's testimony was pure fiction. (App. ¶ 44).  Lucas's testimony is laughable regardless because Transou admits that he was in fact used as a stand-in for Ballard.

Additionally, during a recorded telephone conversation, Transou referred to Lowesco Ballard in the third person, even though it was supposed to be a call with Ballard. (App. ¶ 45). In the written transcript of that call, Lucas falsely changed the identity of the speaker from Ballard to Ronald Davis (another conspiracy victim) in order to mask the obvious inconsistency. (App. ¶ 46). In the new telephone transcript, Lucas also inserted ellipses to eliminate the reference to Ballard altogether, even though the portion eliminated could be clearly heard. (App. ¶ 47). During Bray's cross-examination at Ballard's criminal trial, even though this phone call was to the same phone number Bray had used for the earlier purported Ballard calls, to a person who sounded just like the person who was supposedly Ballard in the earlier calls, but to a person who spoke of Ballard in the third person, Bray claimed that the call was actually to Ron Davis. (App. ¶ 48). Lucas backed Bray's lies with his own false testimony that the call where the recipient referred to Ballard in the third person was to Davis. (App. ¶ 48). Obviously, if the call was with Davis, that call would have needed to be disclosed to Davis' defense, but it was not. (App. ¶ 50).

<u>Joe Ward</u>. In order to frame Joe Ward, Bray had his girlfriend bring drugs to him outside the house, so that Bray could go inside, pretend to make a purchase, and come back out with drugs that he could claim to have purchased. (App. ¶ 62, 66). The recording device that Bray wore recorded that a woman said "take it" to Bray before he went into the house. (App. ¶ 64). Bray's girlfriend's delivery occurred in Lucas's plain view – at Ward's criminal trial, Lucas testified that he never let Bray out of his sight before the Ward deal and that he specifically watched for a drug hand-off. (App. ¶ 65). Although Bray now admits that there was a hand-off, and the recording device actually captured the hand-off, Lucas falsely testified at Ward's criminal trial that it never happened. (App. ¶ 64-65).

<u>Noel Mott</u>. The Mott deal is further evidence Lucas's efforts to hide Bray's sloppy frame-ups from plaintiff and Lucas's other victims. For instance, Lucas ignored that Bray did not turn on his recording device until after the alleged Noel Mott deal was completed. (App. ¶ 67). Also, Lucas was present when Bray used the same stand-in, Darren Transou, to impersonate both Mott and Lowesco Ballard, but did not tell anyone about that fact. (App. ¶ 68).

The Mott case also demonstrates how above the law Lucas believed himself to be during this conspiracy. He admits that he ordered Ohio state troopers to steal money from Mott. (App. ¶ 69). According to Lucas, Mott and others were driving to Detroit to allegedly buy a large quantity of drugs. (*Id.*). Lucas came up with a plan to have Ohio troopers stop the car and essentially steal the money: "Our game plan was to take the money that they were going to use to make the buy up in Detroit before they got up to Detroit. That way, no one would get arrested, if we just took the money and we didn't arrest anyone, so the case could keep going. . . ." (*Id.*). At Lucas's instruction, the "ruse" was for the officers to find the money, "seize the money and identify who was in the vehicles" without charging anyone with doing anything illegal. (*Id.*).

<u>Ronald Davis (a.k.a. Herman Price) and Geneva France</u>. As in the other sham deals, in the Ron Davis/Geneva France investigation, Bray was the confidential informant who purportedly purchased the drugs, supposedly Davis' drugs with France acting as a courier. (App. ¶ 70). Bray now admits under oath that neither Davis nor France was actually involved in the deal. Instead, selling his own drugs, Bray "staged a set-up deal" to frame the person that he thought was Davis. (App. ¶ 70). Bray sought to make it appear as if Davis was delivering drugs through France by staging the deal near Davis' house and using Bray's friend "Shea Shea" (Karmiya Moxley) to pose as France. (App. ¶ 71).

Lucas participated directly in this frame-up drug purchase. Moxley/"Shea Shea" got into the car with Lucas, had a conversation with him, and conducted a drug deal in the close confines of inside a car. (App. ¶ 73). Soon thereafter, Lucas arrested and prosecuted France but never identified that she was not the same person he spoke with earlier in the car, nor did Lucas ever alert plaintiff or any other conspiracy victim to this difference. (App. ¶ 73-74).

As in the other deals, the conspirators' efforts to connect Davis and France to the deal was fiction. While defendants Lucas and Metcalf monitored Bray's recorded telephone call to set up the deal, Bray claimed that he was speaking with Davis, when the recording shows that he was actually speaking to a woman. (App. ¶ 76). In the recording, it sounds as if the woman was trying to deepen her voice to sound like a man, and she said that she would "send the girl." (App. ¶ 76). Immediately after the call, Bray told Lucas and Metcalf that the phone conversation was with Davis and said, "He [Davis] said he's sending his girl." (App. ¶ 77). Lucas's DEA-6 report, however, actually correctly identifies the phone call as one to a female recipient, but does not include that Bray lied and tried to pass the call off as one to Davis. (App. ¶ 77). In an effort to

bolster Bray's false testimony at Price's criminal trial, Lucas testified that he overheard the call between Bray and Davis, though he now admits that this testimony was a lie. (App. ¶ 80).

Given that the phone call connecting Davis to the deal was actually not a phone call with Davis, defendants needed some way to tie Davis to the deal. Accordingly, immediately before the deal, Bray visited the person he believed to be Davis. (App. ¶ 81). But in the recording of that meeting, that person never said anything about the deal, never alluded to Bray needing to meet with a person delivering drugs, and never directed Bray to a location. (App. ¶ 81). Nevertheless, Bray falsely claimed (and later testified) that during this meeting Davis instructed Bray where to meet Davis' drug courier. (App. ¶ 82). Lucas had heard the recording of the meeting and knew this was false testimony, but did nothing to correct it or to alert the defense or any other victim of the conspiracy that the recordings contradicted Bray's testimony and destroyed his credibility. (App. ¶ 82-83). Bray's false testimony occurred in February 2006, months before plaintiff's trial, but it was not disclosed to the prosecution or plaintiff's defense. (App. ¶ 105).

To further bolster Bray's false testimony, Lucas testified falsely at Davis' criminal trial that he saw Davis outside with a gun in his hand when he did not actually see Davis with a gun. (App. ¶ 84). Lucas also testified falsely about an incident during the deal in an effort to salvage Bray's credibility. During the drug deal, there was a dispute about the weight of the drugs being delivered. (App. ¶ 85). Bray pretended to call Davis to resolve the matter, but in actuality did not dial anyone and merely pretended to have a conversation with Davis, in which Davis agreed to give $200 back because the drugs were short. (App. ¶ 85). Bray's phone records support that no call was actually made. (App. ¶ 85). Although this was an entirely fictional conversation, there is evidence that no such call was made, and Bray dealt his own drugs, Lucas testified falsely at

both Geneva France's criminal trial and at his own that he was sitting close enough to Bray that he actually heard Davis say "take two back" on Bray's cell phone. (App. ¶ 86).

In addition to the many obvious examples of Bray lying that Lucas had to be aware of, a few days after the France criminal trial (months before plaintiff's trial), a prosecutor told Lucas that Bray failed three lie detector tests regarding the France/Davis deal and that it appeared Bray has no credibility. (App. ¶ 94). Lucas never documented that admonishment.

## II.  LUCAS IS NOT ENTITLED TO RELIEF UNDER RULE 12(B)(6)

### A.  THE STANDARD FOR 12(B)(6) MOTIONS

In ruling on Lucas's Rule 12(b)(6) motion, this Court "must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 605 (6th Cir. 2005) (internal quotation marks and citations omitted). Dismissal of plaintiffs' complaint is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (quotation marks and citations omitted).

### B.  ACCEPTING THE ALLEGATIONS IN THE COMPLAINT AS TRUE AND CONSTRUING THEM IN PLAINTIFFS' FAVOR, THE ALLEGATIONS PROPERLY STATE A CLAIM FOR RELIEF

Because for the purpose of a 12(b)(6) motion, the allegations in the complaint must be credited as true, there are abundant facts for the purposes of this motion supporting defendant Lucas's culpability for an egregious illegal frame-up of Jason Westerfield. Specifically, Defendant Lucas, Jerrell Bray, and others: "[I]n order to build a false case against [Mr. Westerfield] … fabricated evidence which falsely implicated Mr. Westerfield in the drug ring, and destroyed and/or otherwise withheld from the prosecutors and from Mr. Westerfield evidence which would have helped exonerate him …."  (Complaint, Dkt. No. 1, ¶ 13.) Plaintiff further alleges that "In so doing, the Defendants, acting personally, as well as by and through a

conspiracy with others, coached and manipulated witnesses, and then withheld from the

prosecutors the details of how they had done so. (*Id.* at ¶ 14). Moreover, "Defendants deprived

Mr. Westerfield of due process by manipulating and tampering with evidence in an effort to

falsely implicate and convict Mr. Westerfield." (*Id.* at ¶ 15).

Lucas never actually argues that the complaint fails as a legal matter. The reason for that

lapse is obvious – if Lucas did participate in a conspiracy and intentionally developed false

evidence, tampered with evidence, assisted a witness in committing perjury, misled prosecutors,

and buried exculpatory evidence, all in order to frame plaintiff for a crime that he did not

commit, he would not be entitled to qualified immunity, and plaintiffs would have stated claims

upon which relief may be granted. *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 745 n.2

(6th Cir. 2006) (fabricating evidence violates clearly established law); *Napue v. Illinois*, 360 U.S.

264, 269 (1959) (knowingly using false evidence violates clearly established rights); *United*

*States v. Bagely*, 473 U.S. 667, 679 n.7 (1985) (use of perjured testimony and deliberate

suppression of favorable evidence violates established rights).

In the end, Lucas falls back on his version of the facts, arguing that, if they are credited

instead of plaintiff's allegations, he is entitled to qualified immunity. (Def. Mem. at 20-21). That

argument, of course, does not credit the allegations in the complaint and construe them in the

light most favorable to plaintiffs, as required for a 12(b)(6) motion. Accordingly, Lucas's request

for 12(b)(6) relief must be denied.

## III.     THE APPLICABLE LEGAL STANDARDS, SHOULD THIS COURT FIND THAT IT IS APPROPRIATE TO ADJUDICATE SUMMARY JUDGMENT ON THE MERITS AT THIS JUNCTURE

### A.     THE STANDARD FOR ADJUDICATING SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 546 (6th Cir. 2008); Fed. R. Civ. P. 56(c). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Nance*, 527 F.3d at 547, *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When deciding a motion for summary judgment, a court must view the evidence in favor of the non-moving party and draw all reasonable inferences in that party's favor. *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 650 (6th Cir. 2006), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). [2]

## B.    THE STANDARD FOR ASSESSING QUALIFIED IMMUNITY

Government actors are shielded from liability by qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In order to determine whether a defendant is entitled to qualified immunity, the Sixth Circuit usually uses a two-part test, asking: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established. *Lanman v. Hinson,* 529 F.3d 673, 683 (6th Cir. 2008) (citations omitted).

## C.    ASSESSING CLAIMS OF QUALIFIED IMMUNITY IN THE CONTEXT OF PROBABLE CAUSE

A law enforcement officer is not entitled to immunity and is liable for violating an individual's constitutional rights when the officer "deliberately or recklessly submits false and

---

[2]    When as here qualified immunity turns on factual dispute, summary judgment cannot be decided without discovery.  *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982); *Kinkus v. Village of Yorkville, Ohio*, 289 Fed. Appx. 86, 91 (6th Cir. 2008); *Kain v. Nesbitt*, 156 F.3d 669 (6th Cir. 1998); *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).

material information in a warrant affidavit." *Johnson v. Hayden*, 67 Fed. Appx. 319, 323 (6th Cir. 2003). *See also Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir.1996) (an officer can be held liable "for requesting a warrant which allegedly led to a false arrest if he 'stated a deliberate falsehood or acted with a reckless disregard for the truth'") (citation omitted); *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) ("An action under § 1983 does lie against an officer who obtains an invalid search warrant by making, in his affidavit, material false statements either knowingly or in reckless disregard for the truth.").

The officer cannot rely on the fact that a warrant or indictment issued to establish his right to immunity when that judicial determination was based on his own deliberate subterfuge. *See Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir.1989). The question of whether the warrant would have been issued even without the defendant's knowingly or recklessly false statement is one that should be left for the jury. *Hill*, 884 F.2d at 276, *citing Yancey*.

In a nutshell, to overcome an officer's claim of qualified immunity, a plaintiff must establish: "(1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Hill*, 884 F.2d at 275 (applying the test set forth in Franks v. Delaware, 438 U.S. 154 (1978), to evaluate a § 1983 claim). Treating Lucas's argument as one for summary judgment, plaintiffs would merely need to show that crediting their evidence and drawing all reasonable inferences in their favor, there is a dispute of fact about these two issues. *Hardesty*, 461 F.3d at 650.

### D.    THE STANDARD FOR ASSESSING QUALIFIED IMMUNITY IN THE CONTEXT OF *BRADY* VIOLATIONS

Law enforcement officers are not entitled to qualified immunity for committing *Brady* violations because such conduct violates an accused's clearly established constitutional rights. In

accordance with *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Even when the defense has not specifically requested information in discovery, the prosecution has a duty to volunteer exculpatory evidence if it is "material." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), quoting *Brady*, 373 U.S. at 108. Material evidence is evidence that, if disclosed, "undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 682, 678 (1985).

In keeping with that definition of materiality, for *Brady* purposes, exculpatory evidence includes evidence that impeaches a witness for the prosecution. *See Johnson v. Bell*, 525 F.3d 466, 496 (6th Cir. 2008) ("The Supreme Court has repeatedly 'disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes.'"), *citing Kyles*, 514 U.S. at 433; *Napue v. Illinois*, 360 U.S. 264 (1959) ("jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); *Bagley*, 473 U.S. at 676. Each individual bit of impeachment should not be considered separately; rather the impeachment evidence should be considered cumulatively to assess whether the collective evidence was material. *Kyles*, 514 U.S. at 437-38.

A police officer commits "a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009). In other words, officers inflict "constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information." *Moldowan*, 578 F.3d at 379; *see also Id.*, quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984) (a constitutional violation occurs when an officer makes a "calculated effort to

circumvent the disclosure requirements established by *Brady* [ ] and its progeny."). Where exculpatory evidence is withheld or destroyed by the police, the defendant is not required to prove that the officer acted in bad faith. *Moldowan*, 578 F.3d at 382-89.

A police officer's failure to disclose impeachment evidence is particularly significant when the impeachment of an informant reflects on both the informant's credibility and the caliber of the police work. *Kyles*, 514 U.S. 442, 445-45. In *Kyles*, for instance, the prosecution was aware of evidence impeaching the government's informant. *Id.* at 424-27. Specifically, the police did not report or question the informant's numerous inconsistencies in accusing the defendant. *Id.* at 426-27. The Court held that such evidence was *Brady* material that had to be disclosed both because it undermined the witness directly and also because it was evidence of the police officers' shoddy work. *Id.* at 442 n.13, 445 ("disclosure would have revealed a remarkably uncritical attitude on the part of the police"), 446 n.15 (when "the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it").

### E.  THE STANDARD FOR ASSESSING QUALIFIED IMMUNITY IN TERMS OF FRAMING AN INNOCENT ACCUSED

Officers are liable for violating an accused's constitutional rights if they intentionally developed false evidence, tampered with evidence, assisted a witness in committing perjury, and/or misled prosecutors, in an effort to frame an accused for a crime that he did not commit. *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 745 n.2 (6th Cir. 2006) (fabricating evidence violates clearly established law); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (knowingly using false evidence violates clearly established rights); *United States v. Bagely*, 473

U.S. 667, 679 n.7 (1985) (use of perjured testimony and the deliberate suppression of favorable evidence violates established rights).

Evidence that the defendant officers participated in framing the other Mansfield conspiracy victims is also directly relevant to the issue of whether they also assisted in framing plaintiff. Federal Rule of Evidence 404(b) provides, in pertinent part, that evidence of other crimes, wrongs, or acts may be admissible for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Ev. 404(b). Rule 404(b) evidence is also admissible to show "a common scheme or plan." *United States v. Carney*, 387 F.3d 436, 450 (6th Cir. 2004) (emphasis in original; citation omitted). A defendant's claims "of innocent presence or association . . . routinely open the door to 404(b) evidence. . . ." *United States v. Lattner*, 385 F.3d 947, 957 (6th Cir. 2004). When there is a similarity between the conduct at issue and the other acts, "this renders proof of the prior acts admissible under FRE 404(b) to show plan and method of operation." *Id.* at 957-58.

**F.     THE STANDARDS FOR ASSESSING QUALIFIED IMMUNITY IN TERMS OF PLAINTIFF'S CONSPIRACY THEORY**

The Mansfield frame-ups can be viewed as part of a single conspiracy that was ongoing when Lucas joined, so his active participation in any part of the greater frame-up conspiracy is sufficient to inculpate him in framing the victims like plaintiff, who were arrested well after Lucas joined. *See United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997) (to be liable for a conspiracy a defendant need not have participated in all aspects of the conspiracy; it is sufficient that the defendant "was a party to the general conspiratorial agreement," and "the connection between the defendant and the conspiracy need only be slight").

The conspiratorial agreement "may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Blakeney*, 942

F.2d 1001, 1010 (6th Cir. 1991) (citation omitted). In *United States v. Melendez*, 2004 WL

162937, *2 (E.D. Mich. 2004), for instance, the court found that police officers had a single

conspiracy to violate the civil rights of a number of accused, where "the same modus operandi

was repeated in many of the civil rights violations." The court noted that the defendants planted

incriminating evidence in many of the cases, falsified police reports in a number of the cases, and

used force to unlawfully enter residences in a number of the cases. *Id.* The pattern of conduct

occurred within a ten square mile radius, during a two year time period. *Id.*

Here, the pattern of conduct is similarly apparent – every conspiracy victim was framed

within a nine month period in an alleged sale involving Bray as the buyer. Stand-ins were

frequently used and audio recordings were often altered to make the deals more plausible. Most

of the fake deals involved false case reporting to bury contrary information. All of the fake deals

occurred in the City of Mansfield.

## IV.    LUCAS IS NOT ENTITLED TO QUALIFIED IMMUNITY

The *Brady* violations committed by Lucas are manifest: as detailed above, through his

false reporting, Lucas hid evidence that Bray was stealing drugs and money from the DEA,

dealing his own drugs on the side, and blatantly lying to inculpate people in fictional drug sales.

Lucas also hid evidence of other investigating officers' subterfuge in support of Bray, such as

Metcalf's lies to the prosecutors and Faiths' awareness of the differences between the audio

transmissions and what Bray claimed to have said and heard. Such evidence is sufficient for a

jury to find that Lucas violated plaintiff's clearly established constitutional rights by failing to

disclose impeaching and exculpatory evidence.

As for the evidence of Lucas's participation in a conspiracy to frame plaintiff, there is

evidence that Lucas was part of a conspiracy with a clear *modus operandi* – Bray would

fictionalize drug deals, and the defendant officers would alter recording transcripts, draft

inaccurate or incomplete reports, and do whatever else necessary to make Bray's lies appear plausible. The evidence establishes that Jason Westerfield fell victim to this conspiracy. Indeed, there can be no dispute that he was innocent of at least seven of the eight counts he was charge with – as Lucas admits, Westerfield's co-defendant Tyron Brown told police that Westerfield was the wrong guy, which was confirmed by the fact that Westerfield's electronic monitoring device proved he was home when Bray said he met with him. (Mot. at 18-20). A jury could easily conclude that the allegations against Westerfield fit the conspiracy's pattern.

Finally, there is sufficient evidence for a jury to conclude that Lucas is part of the conspiracy. As set forth above, Lucas's conduct in the deals involving Roosevelt Williams, Dwayne Nabors, Lowesco Balard, Joe Ward, Noel Mott, Ronald Davis, and Geneva France would support a jury finding that Lucas was an active participant.

Defendant's contention that Lucas wasn't personally involved in the investigation of plaintiff (Mot. at 15-18) misses the point. Given the evidence that plaintiff was a victim of a conspiracy in which Lucas participated, it is unnecessary to show Lucas's personal involvement in the underlying investigation. In any event, Lucas does not, and cannot, deny that, even if he was not involved in the investigation leading to plaintiff's arrest, he became involved prior to plaintiff's trial, and yet he did not disclose any of the above described wrongdoing to the prosecutors or plaintiff's counsel. Instead, he kept it all secret, depriving plaintiff of exculpatory evidence which would have led to all the charges against him being dropped.

Lucas asserts that the single count on which plaintiff was convicted was based upon evidence wholly independent of Bray. (Mot. at 20.) There is no evidence to support that assertion, and Lucas points to none. Moreover, even if true, it would not support granting Lucas qualified immunity. Westerfield was charged with eight drug counts: seven related to purported

deals with Bray, and one related to the ensuing search of a physical address. Even if Bray's testimony was unnecessary to support the charge arising from the search (and Lucas points to no evidence to allow the Court to conclude that this is true, or that the Bray's testimony was not essential to the search warrant), the fact that the Defendants had conspired with Bray to fabricate seven of the eight charges against plaintiff is unquestionably exculpatory evidence that Westerfield had a right to know in defending the eighth charge. Lucas thus had a duty to make the prosecutor aware of that information. Indeed, once the previously undisclosed evidence came to light, the prosecutor dismissed all of the charges against plaintiff, not just the seven charges plaintiff admits were tainted by Bray, but the eighth charge premised on the search too. In any event, that plaintiff was acquitted on the seven charges Lucas admits were tainted by Bray's involvement does not make his malicious prosecution claim premised on those charges less viable. *Sykes v. Anderson*, 625 F.3d 294, 309 (6th Cir. 2010); *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005); *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001); *Skousen v. Brighton High Sch.,* 305 F.3d 520, 529 (6th Cir. 2002).

Lucas ventures that plaintiff's claim is somehow deficient because his sentence was ordered to run concurrently with a sentence on a separate conviction that still stands. How much additional time if any Westerfield had to spend in prison goes to damages, not the existence of a claim. Even if he was not incarcerated, he was wrongfully arrested, charged, tried, convicted and sentenced for crimes he did not commit. A jury could easily find that plaintiff is entitled to damages for having to defend against the false charges, and then face the grim prospect of an additional 15 years' imprisonment as an innocent man, even if that result was ultimately avoided, despite defendant's best efforts.

In sum, based on the presently available evidence, a jury could find that Lucas conspired to violate Jason Westerfield's clearly established due process rights.

### Conclusion

Quite simply, Lucas's misguided motion has no factual or legal merit. On the merits, Lucas's 12(b)(6) motion must concede plaintiff's facts in his complaint. The allegations in the complaint are more than sufficient to preclude summary dismissal.

Defendant Lucas has never contested, as a legal matter, that if he failed to tender exculpatory evidence, participated in framing Westerfield, or participated in a conspiracy that included framing Westerfield, he has violated Westerfield's clearly established constitutional rights. There is now evidence supporting each of those allegations. Accordingly, Lucas's assertions of qualified immunity should be denied.

Plaintiffs have not yet had the opportunity to conduct more than preliminary discovery. Presumably, there are even more due process violations to unearth, once discovery is permitted to begin. Nevertheless, based on the available evidence, plaintiffs have demonstrated a clear dispute of fact supporting all of their allegations against Lucas. Plaintiffs ask that defendant's motion be denied so that discovery may finally begin.

RESPECTFULLY SUBMITTED,


/s/ Aaron Mandel
Attorney for Plaintiff

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
Aaron Mandel
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on March 1, 2011, this Motion was served upon counsel of record in this matter via the ECF system.


/s/ Aaron S. Mandel