IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

JASON WESTERFIELD                          )
                                           )
                    Plaintiff,             )
                                           )
                    v.                     )        07 C 3518
                                           )
LEE LUCAS, et al.                          )        Judge Gaughan
                                           )
                    Defendants.            )        JURY TRIAL DEMANDED

**PLAINTIFF'S RESPONSE TO DEFENDANTS' CROSS'S, METCALF'S, FAITH'S,
MAYER'S AND ANSARI'S MOTIONS FOR SUMMARY JUDGMENT**

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
Aaron Mandel
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

Now comes Plaintiff, JASON WESTERFIELD, by his counsel, LOEVY & LOEVY, and respectfully responds in opposition to Defendants Robert Cross's, Chuck Metcalf's, Larry Faith's, Matt Mayer's and Jamal Ansari's motions for summary judgment as follows:

## STATEMENT OF THE ISSUES

This case comes before the Court on Defendants Cross's, Metcalf's, Faith's, Mayer's and Ansari's pre-discovery motions for summary judgment. The issues before the Court are:

(1)   Given that Defendants for the most part concede that if the allegations in the complaint are credited, the complaint alleges that Defendants violated Westerfields's clearly established constitutional rights, is adjudication of the factual dispute at issue – whether Defendants committed the misconduct alleged – proper before allowing Plaintiff further discovery?

(2)   If adjudication of Defendants' motions is proper at this time, is Plaintiff's Rule 56(f) affidavit sufficient to warrant further discovery before requiring a response to summary judgment?

(3)   Alternatively, is there sufficient evidence in the record to deny summary judgment as to Defendants Metcalf, Mayer, Faith, Cross and Ansari?

## SUMMARY OF THE ARGUMENT

Plaintiff Jason Westerfield was one of many victims of a widespread conspiracy in Mansfield to frame innocent people for drug crimes that they did not commit. Defendants have each filed a motion for summary judgment asserting qualified immunity. In the motions, no Defendant disputes that this massive conspiracy existed, nor does any dispute that Westerfield was a victim of it. Additionally, there is little dispute that, as a legal matter, if Plaintiff's allegations are credited, the complaint alleges a violation of clearly established rights, defeating

qualified immunity. Each Defendant principally argues that he did not do anything wrong and was not responsible for the false criminal charges against Westerfield.

Plaintiff's theory of liability is that some of the Defendants were directly responsible for the false prosecutions of Westerfield, but regardless of each Defendant's personal involvement in the Westerfield investigation, the Defendants were aware of significant exculpatory evidence that they failed to turn over to the prosecution or defense. Specifically, Defendants were aware that their confidential "informant" Bray was using the Mansfield investigations to settle personal vendettas, steal from the government, deal his own drugs, lie with abandon, and personally profit by falsely framing innocent people. Thus, at a minimum, the Defendants are liable for burying exculpatory evidence of Bray's widespread deceptions.

The Sixth Circuit has ruled that discovery must be allowed before Plaintiff must defend the factual basis for his liability theories on summary judgment. Based on a balancing of interests, this Court limited such discovery to 20 interrogatories to each Defendant regarding their purported qualified immunity defense, and the deposition of Ansari. Beyond that, no Defendant has yet been deposed, produced documents, or even made initial disclosures. Plaintiff respectfully submits that the attached Rule 56(f) affidavit is sufficient to require further discovery, at a minimum, the deposition of every Defendant. With careful detail and specificity, the affidavit describes the discovery Plaintiff needs to conduct, including the witnesses Plaintiff needs to depose, the basis for believing that those witnesses will have favorable testimony undermining Defendants' assertions of qualified immunity, and the nature of the evidence Plaintiff expects to receive.

Alternatively, there is already ample evidence in the record to defeat Defendants' motions for summary judgment.

## FACTUAL BACKGROUND

Jason Westerfield was charged along with twenty-one others in a superseding indictment with eight drug offenses: two each related to alleged transactions with Jerrell Bray on February 15 and March 12; one related to an alleged transaction with Jerrell Bray on March 15, 2005; two related to an ensuing search of a physical residence on April 25, 2005; and one for conspiracy to possess crack cocaine with intent to distribute between Winter 2004 and November 8, 2005. (App. ¶ 87). After a jury trial, Jason Westerfield was found guilty of one count of possession of cocaine base (crack) with intent to distribute and was sentenced to 360 months of imprisonment. (App. ¶ 88).

Westerfield's supposed drug sales occurred in the midst of a larger conspiracy in which dozens of Mansfield citizens were falsely implicated based on Bray's false testimony and Defendants' doctored and fictitious evidence in support of that testimony. At prosecutors' requests, federal judges have now freed most of those who were wrongfully convicted and incarcerated in this mass frame-up, and Bray is in custody for his role. (App. ¶ 85-86).

Because (with the exception of Ansari) no depositions have yet been taken and no written discovery – not even basic 26(a)(1) disclosures – has been tendered in this matter, there are likely far more facts relevant to Defendants' misconduct that have not yet been uncovered. With that caveat, the evidence unearthed thus far indicates that Defendants had material information that would have severely impeached Bray, themselves, and each other, but rather than disclose that evidence to the prosecution or Westerfield's defense, Defendants affirmatively hid the evidence through omission and false reporting.  There is also evidence that Defendants participated in a larger conspiracy in Mansfield to frame people for drug crimes they did not commit, including framing Jason Westerfield for a drug sale he did not participate in.

## Specific Defendants' Culpable Conduct

<u>Charles Metcalf</u>. Metcalf was primarily responsible for overseeing Bray as an informant and was involved in "the vast majority" of the fake drug buys perpetrated by Bray, not one of which led to an actual trial conviction. (App. ¶ 3, 6). Metcalf was also responsible for setting up the buys involving Bray. (App. ¶ 5). In this capacity, Metcalf supervised every single call Bray made to set up a drug deal. (App. ¶ 17). While Metcalf was overseeing the calls, Bray routinely dialed the same telephone numbers again and again for alleged suspects who had no reason to be reachable on the same phone, called one suspect while claiming he called another, and/or had a different phone encounter from the one detailed in the case report form, and no one ever documented the obvious subterfuge. (App. ¶ 17-18).

Additionally, Metcalf was aware of numerous inaccuracies in the case reports generated documenting the details of the various Mansfield investigations, but he never alerted the prosecution or defense counsel for the conspiracy victims about the false reporting. (App. ¶ 9). Metcalf also routinely failed to document obvious discrepancies between the drug weights allegedly transferred by Bray during the deals and the reality, which allowed Bray to steal drugs from the deals and to deal his own drugs on the side. (App. ¶ 20).

Metcalf was aware that Bray was arrested for drug possession during the time he was acting as a confidential informant, a fact directly related to Bray's credibility that was not disclosed to Westerfield's defense. (App. ¶ 22, 25). In fact, Metcalf intervened on Bray's behalf, so that Bray was not prosecuted. (App. ¶ 24). As the person overseeing Bray, Metcalf also should have been aware that Bray flagrantly shorted the DEA thousands of dollars during the deal framing Dwayne Nabors, an exculpatory fact that goes directly to Bray's credibility, but that Metcalf never documented or revealed to the defense. (App. ¶ 42).

Additionally, Metcalf facilitated targeting a person Bray wanted to seek revenge on. (App. ¶ 31). With Metcalf's assistance, Bray's buys were expanded to accommodate targeting his old grudge (even though that person lacked any apparent connection to the Harris murder supposedly at the heart of the undercover operation). (App. ¶ 31).

Metcalf also now admits that he blatantly lied under oath during the criminal trial of another Mansfield conspiracy victim who was tried alongside Plaintiff, Dwayne Nabors. (App. ¶ 34). Metcalf's fictitious testimony included his false identification of the Defendant and his false claim that the deal was not videotaped, when Metcalf himself had worked the video camera. (App. 34, 39). In explaining his perjury, Metcalf alluded to a conspiracy among the Defendants, explaining, "I really thought this is what everybody else was going to testify to. This is what was on paper. . . . it had to make sense." (App. ¶ 35). Metcalf also alluded to the existence of co-conspirators when he admitted that he swore under oath to the veracity of a search warrant affidavit drafted by one of the other officers even though the affidavit contained numerous false statements about what Metcalf supposedly observed in support of probable cause. (App. ¶ 40).

Metcalf falsely identified Roosevelt Williams as the seller in one of his deals even though Williams was in Chicago at the time, the person impersonating Williams looked nothing like him, and the impersonator was driving a car Metcalf knew to be Bray's. (App. ¶ 43-44, 48). Metcalf did not alert the prosecution or Plaintiff's defense to the fact that the case report for that deal was altered, changing the make of the car driven (to hide that it was Bray's), or that the case report omitted that detective Wheeler (who knew Williams well) adamantly contended that Williams had been falsely identified. (App. ¶ 46, 49-50).

During the Lowesco Ballard frame up, Metcalf monitored a recorded telephone conversation, in which stand-in Darren Transou referred to Ballard in the third person, even

though he was supposed to be impersonating Ballard. (App. ¶ 56, 59). In the written transcript of that call, Defendant Lucas changed the identity of the speaker from Ballard to another suspect and eliminated the reference to Ballard altogether, presumably to mask the obvious inconsistencies. (App. ¶ 57-58). Metcalf did nothing to correct these changes or to alert the prosecution or Plaintiff's defense about the subterfuge. (App. ¶ 59).

While Metcalf was responsible for monitoring the calls in Danny Brown's criminal investigation, Bray made 30 unsuccessful phone call attempts, trying to get Brown to commit to a drug deal. (App. ¶ 17, 61-62). Bray then told the officers that Brown's telephone number was changed to a number that was actually registered to Robert Harris, another target of the investigation. (App. ¶ 63). Two subsequent monitored calls were attributed to Brown, but were instead recognizable as being to Robert Harris. (App. ¶ 64). Metcalf did not inform the prosecution or Plaintiff's defense about the ruse to ensnare Brown. (App. ¶ 71).

<u>Matt Mayer</u>. Mayer, along with Metcalf, was responsible for overseeing Bray as an informant. (App. ¶ 3). Mayer was personally involved in almost every deal involving Bray and was responsible for setting up the undercover buys, which supports an inference that Mayer was aware of most of the same deceit and subterfuge Metcalf knew about. (App. ¶ 3, 5). Like Metcalf, Mayer was aware of some of the false reporting that went on during the Mansfield investigations, a fact he never disclosed to the prosecution or Plaintiff's defense. (App. ¶ 9). Mayer also never alerted anyone to blatant discrepancies between the drug weights Bray claimed to buy and the actual weight of the drugs received, which allowed Bray to steal drugs. (App. ¶ 20). In fact, Mayer was the officer who found hidden crack cocaine behind the steering wheel in Bray's car after one drug deal. (App. ¶ 23). Bray's attempt to steal drugs while acting as an informant was not reported or prosecuted. (App. ¶ 22-25).

<u>Larry Faith</u>. Faith was responsible for setting up Bray's drug buys and for supervising Mayer and Metcalf, supporting an inference that Faith knew of some or all of the subterfuge that the other two were aware of. (App. ¶ 4-5). For example, Faith knew that Bray tried to keep drugs from at least one deal by hiding the in his car. (App. ¶ 22). Faith also testified that he was aware of some of the false reporting in the Mansfield investigation, and he admitted to inaccurate statements in his sworn affidavit in one of the investigations. (App. ¶ 9, 12).

Faith usually monitored the transmitter Bray wore during the undercover buys. (App. ¶ 4). In that capacity, Faith sometimes heard the reality of a situation on the transmitter, along with Bray's fictionalized version, yet he failed to report or challenge the inconsistencies. For instance, Faith monitored the transmitter when Bray claimed that he paid a higher amount than what he actually paid for drugs during a staged drug deal and then hid the balance of the money inside his car radio. (App. ¶ 26). Faith was present when the theft was uncovered and the money Bray tried to hide was found, but Faith never reported this highly impeaching fact to the prosecution or Plaintiff's defense. (App. ¶ 26-27).

Faith also became aware that Bray was using his role as a confidential informant to pursue at least one personal vendetta, targeting an individual who had nothing to do with the Mansfield investigation, but who did not testify favorably to Bray years ago when Bray was charged with manslaughter. (App. ¶ 32). Faith did not disclose Bray's efforts to target personal nemeses, even though that fact impeaches Bray's credibility generally. (App. ¶ 33).

Additionally, Faith buried exculpatory evidence during the alleged Roosevelt Williams deal, when Williams was in Chicago and the person impersonating Williams looked nothing like him. (App. ¶ 43, 48-50). Detective Wheeler was very familiar with Williams prior to this deal, having spent hours watching him during surveillance. (App. ¶ 47). Immediately after the deal,

detective Wheeler informed Defendant Faith that the suspect identified as Roosevelt Williams was misidentified – Williams is tall, thin, and light-skinned with freckles, while the person Defendants identified as Williams was short, dark-skinned, and stocky. (App. ¶ 48-49). The case report for this deal, however, not only omits Wheeler's claims, it omits his presence at the scene altogether. (App. ¶ 50). Faith never alerted anyone to the misidentification, nor did he ever tell Plaintiff's defense of the other officers' false report. (App. ¶ 50, 52).

Finally, during the deal falsely attributed to Danny Brown, the transmitter that Faith likely monitored recorded Bray accidentally slipping and telling the courier, "Here, give that to Chris," instead of telling him to give the money to Brown. (App. ¶ 68-69). The reference to Chris was in all likelihood to Chris Jordan, a known drug dealing friend of Bray's who Bray tried to keep clean of all charges. (App. ¶ 67). When the transcript of the exchange was altered by one of the Defendants to omit the statement, "give that to Chris," Faith was again silent about the Defendants' subterfuge. (App. ¶ 70-71).

Robert Cross. At the criminal trial of Defendant Lee Lucas for his role in the frame-ups, law enforcement officer after officer testified that the case reports generated in the Mansfield investigations were full of false statements, but no Defendant ever alerted the prosecution or defense counsel for the conspiracy victims about the reports' inaccuracies. (App. ¶ 9). Defendant Cross, along with Defendant Lucas, was responsible for the inaccurate reports. (App. ¶ 11). The false reporting is even more suspicious because Cross admits that he might have destroyed his notes relating to the Mansfield investigations. (App. ¶ 28). Cross's likely destruction of evidence was not disclosed to Plaintiff's defense. (App. ¶ 29).

Cross also participated in the false identification of Roosevelt Williams, who as noted, was in Chicago at the time of the drug deal and looked nothing like the person impersonating

him. (App. ¶ 43-44, 48). The false reporting resulting from that deal changed the make of the car driven by the dealer, to hide that the car was actually Bray's, and omitted detective Wheeler's presence and his claim that Williams was falsely identified. (App. ¶ 45-46, 49).

Finally, Cross admits that the Joshawa Webb deal did not abide by DEA procedures, but he did nothing to alert the prosecution or Webb's defense about the irregularities. (App. ¶ 60).

Jamaal Ansari. Evidence shows that Ansari caught Bray stealing money given to him for a drug buy, while acting as a DEA informant. (App. ¶ 13). Although this is undeniably exculpatory evidence, severely impeaching Bray, Ansari neither documented this theft, nor disclosed it to Plaintiff – instead, the report of that buy affirmatively hid the theft, stating that Bray returned the money to Lucas after the buy. (App. ¶ 13).

Ansari also falsely identified the stand-in impersonator at Roosevelt Williams' deal as Williams and the stand-in impersonator at Dwayne Nabors' deal as Nabors. (App. ¶ 36, 43-44). Moreover, Ansari ran the license plate on the car driven by the Williams impersonator during that deal and learned that the car was actually registered to Bray. (App. ¶ 45). Ansari did not alert anyone to the fact that this information was omitted from the investigative report and the report was amended to falsely change the make of the car, in order to hide the fact that it was Bray's car used by Bray in an earlier deal. (App. ¶ 46, 52).

Metcalf and Faith's Brady Violations during the Davis/France Investigation. The Ronald Davis (a.k.a. Herman Price) frame-up epitomizes Defendants' roles in helping Bray to frame innocents by suppressing Brady material – Brady material that would have been exculpatory evidence in Westerfield's case in that it would have severely impeached the prosecution's essential witness. Bray now admits under oath that Ronald Davis was not actually involved in the deal attributed to him. Rather, Bray sold his own drugs and "staged a set-up deal" to frame

10

Davis. (App. ¶ 72). While Defendants Lucas and Metcalf monitored Bray's recorded telephone call to set up the deal, Bray claimed that he was speaking with Davis, when the recording shows that he was actually speaking to a woman. (App. ¶ 78-79). In the recording, it sounds as if the woman was trying to deepen her voice to sound like a man, and she said that she would "send the girl." (App. ¶ 78). Immediately after the call, Bray told Lucas and Metcalf that the phone conversation was with Davis and said, "He [Davis] said he's sending his girl." (App. ¶ 79). The officers' case report, however, correctly identifies the phone call as one to a female recipient, but does not include that Bray lied and tried to pass the call off as one to Davis. (App. ¶ 79).

Immediately before purportedly meeting Davis' courier, Bray visited Davis. (App. ¶ 80). In the recording of that meeting, Davis made no reference to the purported deal or Bray's purported meeting with a dealer, and never directed Bray to a location. (App. ¶ 80). Nevertheless, Bray falsely claimed that during this meeting Davis instructed Bray where to meet Davis' drug courier. (App. ¶ 81). Defendants Metcalf and Faith monitored Bray's wire during this meeting, and thus heard the complete absence of any reference to the deal whatsoever on the suspect's part. (App. ¶ 81). Again, they did not document or reveal Bray's blatant lie.

After that fake drug deal, Defendant Faith filed an affidavit to obtain a search warrant for Davis' residence. (App. ¶ 83). The affidavit included two knowingly false statements. First, though Faith monitored the audio which contradicted Bray, Faith averred that Bray had told Lucas that Davis told him to meet "his girl" at a specific address. And second, Faith falsely averred that, prior to the deal, Davis promised Bray he would send his girl. (App. ¶ 79-81, 83).

Despite all of the exculpatory material delineated above, in the criminal cases against Westerfield, the prosecution informed Westerfield's defense that it was not aware of any exculpatory materials to disclose. (App. ¶ 90).

# ARGUMENT

## I.  LEGAL STANDARDS

### A.  THE STANDARD FOR ADJUDICATING SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 546 (6th Cir. 2008); Fed. R. Civ. P. 56(c). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Nance*, 527 F.3d at 547, *quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986). When deciding summary judgment, a court must draw all reasonable inferences in the non-moving  party's favor. *Hardesty v. Hamburg Twp*., 461 F.3d 646, 650 (6th Cir. 2006), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.  THE STANDARD FOR ASSESSING QUALIFIED IMMUNITY

Government actors are shielded from liability by qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To decide qualified immunity, the Sixth Circuit uses a two-part test, asking: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established. *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008) (citations omitted). As explained in detail below (*see* Section IV(A)), officers are not entitled to qualified immunity when they withhold, suppress, or destroy exculpatory material because a criminal defendant's right to be free from such unfair tactics has been clearly established for decades. *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009).

## II.     DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ARE PREMATURE

The Sixth Circuit ruled that Plaintiff is entitled to have some discovery before defending summary judgment based on the factual issues here. To date, Plaintiff has had only a very limited opportunity for discovery, and still has not had the chance to depose any Defendants other than Ansari, Plaintiff respectfully submits that summary judgment would be premature at this time. The cases where summary judgment on the issue of qualified immunity can be adjudicated pre-discovery involve the *legal* question at the heart of qualified immunity – does the complaint allege a violation of a clearly established right? The factual question principally raised by the Defendants' motions here – did the officers do what the complaint alleges they did? – cannot be resolved until after discovery on the issue is permitted.

### A.     QUALIFIED IMMUNITY HERE TURNS ON FACTUAL DISPUTES THAT CANNOT BE RESOLVED WITHOUT DISCOVERY

Qualified immunity raises two distinct inquiries. First, there is the legal analysis that must be conducted at the earliest possible stage of the litigation, even before discovery. When evaluating such pre-discovery qualified immunity claims, if the plaintiff's allegations fail to "state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Second, there is the factual analysis, asking whether the Plaintiff has sufficient evidence to create a dispute of fact for trial.

#### 1.     PLAINTIFF ALLEGES VIOLATIONS OF HIS CONSTITUTIONAL RIGHTS.

Only Faith and Mayer even dispute the legal component of qualified immunity – that crediting Plaintiff's allegation, a violation of his clearly established constitutional rights occurred. *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 745, fn. 2 (6th Cir. 2006) (defendant would have violated Plaintiff's constitutional rights by knowingly fabricating

evidence against him in a manner reasonably likely to affect the jury's verdict); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State" must fail under the Fourteenth Amendment); *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009) (withholding or suppressing exculpatory material violates clearly established constitutional rights).

Faith and Mayer assert that the sole count on which Plaintiff was convicted was based upon evidence "wholly independent" of Bray. But they point to no evidence to support that assertion. Even if Bray's testimony was unnecessary to support the charge arising from the search (and Faith and Mayer point to no evidence to allow the Court to conclude that this is true, or that Bray's testimony was not essential to the search warrant), that the same investigators had conspired with Bray to fabricate evidence to support the other charges against Plaintiff is unquestionably exculpatory evidence that Westerfield had a right to know in defending the charge. Defendants thus had a duty to make the prosecutor aware of that information. Indeed, once the previously undisclosed evidence came to light, the judge vacated the charge premised on the search. In any event, that Plaintiff was acquitted on certain charges Defendants admit were tainted by Bray's involvement does not make Plaintiff's malicious prosecution claim premised on those charges less viable. *Sykes v. Anderson*, 625 F.3d 294, 309 (6th Cir. 2010); *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005); *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001); *Skousen v. Brighton High Sch.,* 305 F.3d 520, 529 (6th Cir. 2002).

Faith and Mayer also venture that Plaintiff's claim is somehow deficient because his sentence was ordered to run concurrently with a sentence on a separate conviction that still stands. How much additional time if any Westerfield had to spend in prison goes to damages, not

14

the existence of a claim. Even if he was not independently incarcerated, he was wrongfully arrested, charged, tried, convicted and sentenced for crimes he did not commit. A jury could easily find that Plaintiff is entitled to damages for having to defend against the false charges, and then face the grim prospect of an additional 15 years' imprisonment as an innocent man, even if that result was ultimately avoided, despite Defendant's best efforts.

In sum, the complaint adequately alleges that Defendants conspired to violate Jason Westerfield's clearly established due process rights.

> **2.** **THE DISPUTE OF FACT AT ISSUE IN THE QUALIFIED IMMUNITY ANALYSIS CANNOT BE RESOLVED WITHOUT FURTHER DISCOVERY**

The rest of Defendants' motions are based solely on factual disputes, namely each Defendant's claim that he did not commit the acts alleged.

While the legal analysis for qualified immunity should be conducted pre-discovery, the law is clear that the factual analysis cannot be undertaken without first allowing discovery. *See, e.g., Mitchell*, 472 U.S. at 526 ("if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment *if discovery fails to uncover* evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.") (emphasis added); *Harlow*, 457 U.S. at 817-18 (plaintiff is entitled to some discovery before having to defend factual question – whether there is sufficient evidence to prove defendants committed those violations); *Kinkus v. Village of Yorkville, Ohio*, 289 Fed. Appx. 86, 91 (6th Cir. 2008) (summary judgment should be granted on factual issues at heart of qualified immunity analysis only when evidence obtained in discovery shows no genuine issue as to any material fact); *Kain v. Nesbitt*, 156 F.3d 669 (6th Cir. 1998) (when adjudicating a pre-discovery motion for summary judgment based on qualified immunity, the court may only consider the legal question of whether, crediting plaintiff's allegations, a

15

clearly established constitutional right was violated; the court may not yet assess the factual support for the allegations).

In qualified immunity cases, it is error to grant pre-discovery summary judgment on an evidentiary dispute regarding whether the official actually committed the illegal conduct precisely because, in resolving a pre-discovery summary judgment motion, the court is required to "[assume] the truth of the plaintiff's allegations [to determine whether] the official's conduct violated clearly established law." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). Thus, at the pre-discovery stage here, the Court must credit the allegations in the complaint and determine only whether the allegations state a claim for a violation of a clearly established right.

The Court in *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998), described the dichotomy between pre-discovery legal questions and factual questions that should not be resolved until after discovery. First, when a defendant files a pre-discovery motion claiming qualified immunity, "the district court should resolve that threshold question before permitting discovery. To do so, the court determines whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law." *Id*. Importantly, the Court concluded, "If the plaintiff's action survives these initial hurdles and is otherwise viable, the plaintiff ordinarily will be entitled to some discovery." *Id*. The district court may limit discovery to make it less burdensome on the official, but the plaintiff should be permitted some discovery before defending qualified immunity based on facts. *Id*. at 598-600 (" the judge should give priority to discovery concerning issues that bear upon the qualified immunity defense, such as the actions that the official actually took, since that defense should be resolved as early as possible.").

There is no support for Defendants' effort to require Plaintiff to prove his claims, without first requiring Defendants to be deposed so that Plaintiff can obtain the necessary evidence.

III.    **EVEN IF DEFENDANTS' SUMMARY JUDGMENT MOTIONS ARE PROPER AT THIS JUNCTURE, PLAINTIFF'S RULE 56(F) AFFIDAVIT PRECLUDES SUMMARY JUDGMENT**

Assuming for the sake of argument that Plaintiff generally can be required to rebut Defendants' version of the facts without more than the cursory discovery than Plaintiff has had here so far, Plaintiff can show he needs further discovery in this particular case. Here, Plaintiff's Rule 56(f) affidavit (attached hereto as Exhibit 12) more than complies with those standards.[1] Specifically, the affidavit sets forth why Plaintiff expects discovery to yield responsive evidence. As set forth in that affidavit, in the criminal trial against Defendant Lucas, the testimony of many of the witnesses suggested that there were many law enforcement officers, including the Defendant officers, who were aware that innocent people were being framed for crimes they did not commit and either affirmatively participated in the ruse or helped to propagate the fiction. The examples delineated in the affidavit are far-reaching and compelling – they are more than sufficient to warrant discovery. As described in Plaintiff's affidavit, Defendants' recent document production is no substitute for depositions. At a minimum, there is no substitute for deposing the Defendants and the other witnesses set forth in the affidavit, at least as to the issue of qualified immunity, before requiring an answer to summary judgment.[2]

The criminal trial against Defendant Lucas in no way undermines the validity of the Rule 56(f) affidavit, but that argument is equally unavailing. To state the obvious, none of the Defendants here were on trial during that case. Accordingly, as set forth in Plaintiff's Rule 56(f)

_____

[1]    Plaintiff acknowledges that this Court already has considered this affidavit and decided not to allow depositions, with the exception of Ansari, at that time, and only interrogatories with respect to the other defendants. Plaintiff respectfully submits that more discovery should now be allowed, as a matter within the Court's discretion, and also for purposes of preservation.

[2]    Defendants may argue that the Rule 56(f) affidavit is inadequate because they claim it does not specify precisely what discovery will reveal and how exactly that evidence will link each individual defendant to the conspiracy. As this Court is aware, those exact arguments were futilely raised and ultimately rejected in the prior appeal here..

affidavit here, the important questions for this case as to these Defendants all went unasked. The prosecution's evidence was aimed at proving Lucas' guilt, and no effort was made by either party to prove the guilt of the Defendants in this case. Some Defendants in this matter (Mayer, Metcalf, Faith, and Cross) did take the stand and deny their knowledge of the frame-ups, but none were rigorously questioned on that point, nor were any asked about each other's culpability. Thus, such testimony was no different from Defendants' "I didn't do it" affidavits and does nothing to obviate the need for discovery.

Finally, Defendants argue that even if Westerfield was framed, Plaintiff so far lacks evidence proving their personal involvement. This argument is just another variation of "I didn't do it" –a factual argument that requires discovery before Plaintiff is required to submit evidence. Moreover, even if any Defendant did not personally frame Plaintiff (though it appears many did), he is still liable for his failure to disclose exculpatory materials. *See* Argument IV(A).

The evidence set forth in Plaintiff's appendix and Rule 56(f) affidavit strongly suggests that regardless of each individual Defendant's involvement specifically in investigating or arresting Westerfield, each Defendant took actions to help hide significant *Brady* material related to Jerrell Bray and each other's misconduct from Westerfield's defense. That alone could be used to establish liability, even if – after discovery – it appears that an individual Defendant did not participate in Westerfield's case directly.

Defendants continue to operate under the misapprehension that if they were not personally involved in the Westerfield investigation or arrest they are absolved of all possible liability, but that is just not so. This is a conspiracy case, and if the Defendants actively buried the fact that Bray, Lucas, and others were framing people left and right for crimes that they did not commit, they can be liable even if they were not the ones who investigated Westerfield.

IV.     **ALTERNATIVELY, THERE IS SUFFICIENT EVIDENCE IN THE RECORD TO DENY SUMMARY JUDGMENT AS TO MOST OF THE DEFENDANTS**

A.      **ASSESSING QUALIFIED IMMUNITY IN TERMS OF BURYING EXCULPATORY EVIDENCE**

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Even absent a specific request by the defenses, the prosecution has a duty to volunteer exculpatory evidence if it is "material." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), *quoting Brady*, 373 U.S. at 108. Evidence is material if, disclosed, it "undermines confidence in the outcome of the trial." *United States v. Bagle*y, 473 U.S. 667, 682, 678 (1985).

In keeping with that definition of materiality, for *Brady* purposes, exculpatory evidence includes evidence that impeaches a witness for the prosecution. *See Johnson v. Bell*, 525 F.3d 466, 496 (6th Cir. 2008) ("The Supreme Court has repeatedly 'disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes.'"), *citing Kyles*, 514 U.S. at 433; *Bagley*, 473 U.S. at 676. Each individual bit of impeachment should not be considered separately; rather the impeachment evidence should be considered cumulatively to assess whether the collective evidence was material. *Kyles*, 514 U.S. at 437-38

A police officer commits "a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009). In other words, officers inflict "constitutional injury when they hide, conceal, destroy, withhold, *or even fail to disclose material exculpatory information*." *Moldowan*, 578 F.3d at 379 (emphasis added); *see also Id*., *quoting California v. Trombetta*, 467 U.S. 479, 488 (1984) (a constitutional violation occurs when an officer makes a "calculated effort to circumvent the disclosure requirements established by *Brady* [ ] and its progeny.").

Where exculpatory evidence is withheld or destroyed by the police, the Defendant is not required to prove that the officer acted in bad faith. *Moldowan*, 578 F.3d at 382-89.

A police officer's failure to disclose impeachment evidence is particularly significant when the impeachment of an informant reflects on both the informant's credibility and the caliber of the police work. *Kyles*, 514 U.S. 442, 445-45. In *Kyles*, for instance, the prosecution was aware of evidence impeaching the government's informant. *Id.* at 424-27. Specifically, the police did not report or question the informant's numerous inconsistencies in accusing the Defendant. *Id.* at 426-27. The Court held that such evidence was *Brady* material that had to be disclosed both because it undermined the witness directly and also because it was evidence of the police officers' shoddy work. *Id.* at 442 n.13, 445 ("disclosure would have revealed a remarkably uncritical attitude on the part of the police"), 446 n.15 (when "the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it").

An officer is not entitled to qualified immunity for the constitutional violation resulting from a *Brady* violation because "any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights." *Moldowan*, 578 F.3d at 382. In *Moldowan*, the Sixth Circuit held that application of the due process guarantees recognized in *Brady* to police officers was "clearly established" as of the early 1990's, when the defendant police officer in that case failed to reveal exculpatory evidence to the Plaintiff who then faced criminal charges. *Id.* at 381. *See also Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir.1999) (relying on *Brady* to conclude that plaintiff had raised claims against a police officer that implicated clearly established constitutional rights).

**B.** **EVEN IF THIS COURT WERE TO ADJUDICATE SUMMARY JUDGMENT PRE-DISCOVERY, DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

**1.** **METCALF IS NOT ENTITLED TO SUMMARY JUDGMENT**

A jury could certainly infer from Metcalf's blind eye to Bray's lies and his failure to question or document Bray's inconsistencies that Metcalf violated *Brady* by failing to report the deception. *See Kyles*, 514 U.S. 442, 445-45. Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences on Plaintiff's behalf, as required at this stage, one could also easily conclude that Metcalf was well aware of widespread deceit in the Mansfield investigations generally and rubber stamped the wider conspiracy by not reporting or confronting Bray or the other Defendants about the subterfuge replete throughout the investigations.

As detailed in the factual background section, Metcalf supervised Bray, oversaw all of the fake phone calls purporting to set up the deals, and was well aware of the rampant false case reports. (App. ¶ 3, 5, 17). Metcalf let Bray fudge phone numbers and addresses to make the cases work, and he ignored discrepancies in the drug weights, so that Bray could steal drugs from the deals and deal his own drugs on the side. (App. ¶ 15, 18, 20). When Bray was arrested for drug possession, involving drugs he stole from an investigation, Metcalf not only failed to report it, he intervened on Bray's behalf to protect Bray from prosecution. (App. ¶ 22, 24-25). Additionally, it is reasonable to infer that Metcalf knew Bray flagrantly shorted the government thousands of dollars during the deal framing Dwayne Nabors, and Metcalf admitted that he assisted Bray in targeting old vendettas through the investigation. (App. ¶ 31, 42). All of this information fits squarely into impeaching evidence for the prosecution's key witnesses against Plaintiff (Bray and himself). Metcalf's efforts to bury the information constitute *Brady* violations.

Metcalf's direct participation in framing Danny Brown can be seen in the phone call gamesmanship used: Bray made thirty calls in which he failed to establish a deal with Brown,

and then used a phone call to Robert Harris' number, with a person readily identifiable as Harris, to inculpate Brown. (App. ¶ 61-64). As Metcalf supervised Bray during those calls, he was directly complicit in the frame-up effort. (App. ¶ 17).

Metcalf's admissions that he blatantly lied under oath to falsely identify Dwayne Nabors is also evidence both of the conspiracy Metcalf was a part of (he testified because he believed it was "what everybody else was going to testify to" and he wanted to support the false reports) and evidence of yet another *Brady* violation, as Metcalf was a potential witness in Plaintiff's case. (App. ¶ 34-35, 39). Likewise, Metcalf's false identification of Roosevelt Williams and his failure to alert anyone to the deceptive reports drafted and altered by his colleagues to support that misidentification is both evidence of Metcalf's participation in the conspiracy and evidence of even more *Brady* violations. (App. ¶ 43-44, 46, 48-50). The same is true of Metcalf's complicity in the altered transcripts in the Lowesco Ballard frame-up. (App. ¶ 17, 56-59).

Metcalf's affidavit in support of qualified immunity does not address (much less deny) any of these allegations. Because they are sufficient to create a dispute of fact about Metcalf's participation in the frame-up conspiracy, summary judgment should be denied.

Metcalf disputes that there is evidence that any evidence he withheld was material. But the United States conceded that Metcalf's conduct during the Nabors trial, coupled with his failure to disclose it to Westerfield, violated Westerfield's rights. *See Westerfield v. United States*, No. 05-537, slip op. at 4-5 (N.D. Oh. Dec. 3, 2010) ("The government acknowledges that Detective Charles Metcalf, unbeknownst to the government at the time, lied during the *Nabors* trial in which he testified and in which Westerfield was a co-defendant.") Based on the concession, the trial court had no trouble vacating Westerfield's conviction. *Id.*

## 2.    MAYER IS NOT ENTITLED TO SUMMARY JUDGMENT

Given that Mayer was responsible for overseeing Bray as an informant and was personally involved in almost every deal involving Bray, it is reasonable to infer that Mayer was aware of the same general frame-up efforts Metcalf knew about. (App. ¶ 3, 5). Like Metcalf, Mayer was aware of but never disclosed some of the false reporting that went on during the Mansfield investigations, Mayer never confirmed the addresses Bray attributed to suspects, and Mayer never alerted anyone to blatant discrepancies between the drug weights Bray claimed to buy and the actual weight of the drugs received. (App. ¶ 9, 15, 20). Mayer's failure to disclose these impeaching facts is evidence of further *Brady* violations.

Along that same vein, Mayer found hidden crack cocaine behind the steering wheel in Bray's car after one drug deal, a fact that was neither reported or prosecuted. (App. ¶ 22-24). Construing that evidence in Plaintiff's favor, it is reasonable to infer that Bray was trying to steal the drugs, which is powerful *Brady* material, but Mayer never reported that theft attempt, despite its profound impeachment value. Accordingly, there is evidence supporting disputes of fact about whether Mayer helped participated in the frame-up conspiracy generally and violated Plaintiff's constitutional rights by burying exculpatory evidence.

## 3.    FAITH IS NOT ENTITLED TO SUMMARY JUDGMENT

One could reasonably infer from the fact that Faith was responsible for setting up Bray's drug buys and for supervising Mayer and Metcalf, that Faith was aware of much of the subterfuge that went on. (App. ¶ 4-5). Faith knew that Bray was using his role as an informant to target a personal vendetta who had nothing to do with the investigation. (App. ¶ 32). Faith also knew that Bray hid drugs in his car after one deal, in an attempt to steal some of the drugs from the deal for himself, and Bray claimed a higher amount than what he actually paid for drugs during a staged drug deal and then hid the balance of the money inside his car radio. (App. ¶ 22,

26-27). Additionally, Faith was aware of some of the false reporting in the investigations, and he admitted to inaccurate statements in his own sworn affidavit in one of the investigations. (App. ¶ 9, 12). Faith never reported or disclosed the two attempted thefts, the false reports, or any of the other highly impeaching *Brady* material.

Faith also directly contributed to the effort to frame DannyBrown. Specifically, although he monitored the audio recording device, Faith failed to disclose when the transcript was altered to omit Bray's statement to give the money to Chris instead of Danny. (App. ¶ 68-71).

The evidence also supports that Faith was an active member of the frame-up conspiracy.. For instance, he buried exculpatory evidence during the alleged Roosevelt Williams deal. When detective Wheeler informed Faith that Williams was misidentified, Faith failed to report it and remained silent when Wheeler's participation in the investigation was purged from the case report. (App. ¶ 47-50, 52). In the Ronald Davis deal, Faith never documented or reported Bray's lies, and instead filed a false affidavit in support of search warrant incorporating the lies. (App. ¶ 83). Such complicity demonstrates Faith's direct participation in the conspiracy as well as his complete disregard for his obligations under *Brady*. This evidence defeats summary judgment.

### 4.   CROSS IS NOT ENTITLED TO SUMMARY JUDGMENT

Defendant Cross's participation in this conspiracy is apparent from the fact that he was largely responsible for drafting the case reports for the Mansfield investigations, and those reports were full of patently false statements, a fact that was again not disclosed to Plaintiff. (App. ¶ 9, 11). A jury could easily infer Cross's intentional participation in the conspiracy from his multitude of false reports, especially because Cross has admitted that he might have destroyed his notes relating to the Mansfield investigations. (App. ¶ 28). Cross's likely destruction of evidence was not disclosed to Plaintiff's defense, constituting yet another potential *Brady* violation. (App. ¶ 29).

Cross also participated in the false identification of Roosevelt Williams, who was in Chicago at the time of the drug deal and looked nothing like the person impersonating him. (App. ¶ 43-44, 48). The false report from that deal changed the make of the car driven by the dealer, to hide that the car was actually Bray's and omitted detective Wheeler's presence and Wheeler's claim that Williams was falsely identified. (App. ¶ 45-46, 49). Finally, Cross admits that the Joshawa Webb deal did not abide by DEA procedures, but he did nothing to alert the prosecution or Webb's defense counsel about the irregularities. (App. ¶ 60). Cross's silence in the face of serious police misconduct and his own pattern of false reporting to bury *Brady* materials subjects him to potential liability and defeats summary judgment.

## 5.    ANSARI IS NOT ENTITLED TO SUMMARY JUDGMENT

Like the others, Ansari also helped bury exculpatory evidence. The evidence reveals that Ansari caught Bray stealing money given to him for a drug buy, while acting as a DEA informant. (App. ¶ 13). Although this is undeniably impeachment evidence, Ansari did not document the theft, and it was affirmatively hidden from Westerfield – the report of the buy just said that Bray returned the money to Lucas after the buy. (App. ¶ 13).

Ansari also demonstrated his participation in the conspiracy by falsely identifying the stand-in impersonator at Roosevelt Williams' deal as Williams and the stand-in impersonator at Dwayne Nabors' deal as Nabors. (App. ¶ 36, 43-44). Moreover, Ansari ran the license plate on the car driven by the Williams impersonator during that deal and learned that the car was actually registered to Bray. (App. ¶ 45). Ansari did not alert anyone to the fact that this information was omitted from the report and the report was amended to falsely change the make of the car, in order to hide the fact that it was Bray's car used by Bray in an earlier deal. (App. ¶ 46, 52).

## CONCLUSION

Defendants have for the most part not even contested, as a legal matter, that if they failed to tender exculpatory evidence, participated in framing Westerfield, or participated in a conspiracy that included framing Westerfield, they violated Westerfield's clearly established constitutional rights. There is now evidence supporting each of those allegations. Accordingly, Defendants' assertions of qualified immunity should be denied. To the extent the Court holds that the evidence regarding any particular defendant is insufficient to overcome summary judgment, Plaintiff respectfully renews his request to at least depose that Defendant.

RESPECTFULLY SUBMITTED,


/s/ Aaron Mandel
Attorney for Plaintiff

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
Aaron Mandel
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on March 7, 2011, this Motion was served upon counsel of record in this matter via the ECF system.


/s/ Aaron S. Mandel⎯⎯⎯⎯⎯