IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| JASON WESTERFIELD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:07-cv-3518-PAG |
| | ) | |
| THE UNITED STATES OF AMERICA, et al. | ) | Judge Patricia A. Gaughan |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**Plaintiff's Response to United States' Motion to Dismiss
Plaintiff's FTCA Claims or, Alternatively, for Summary Judgment**

Jon Loevy
Aaron Mandel
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May St., Ste. 100
Chicago, IL 60607
(312) 243-5900

Attorneys for Plaintiff

October 13, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Background Information  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    DEA Agent Lee Lucas' False Reporting and Perjury Before the Grand Jury Caused Mr.
    Westerfield's Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Westerfield's Conviction for Count 30  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.    DEA Agent Lee Lucas' Perjury to Secure Mr. Westerfield's Indictment, Lucas'
           Intentional False Reporting, and His Subornation of Perjury Are Not Protected
           Discretionary Functions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           A.    An Explanation of the Discretionary Functions Exception  . . . . . . . . . . . 11

           B.    The Sixth Circuit Has Determined that the Duties of Law Officers are
                  Generally Not Protected as Discretionary Functions . . . . . . . . . . . . . . . 12

           C.    The Discretionary Function Exception Does Not Apply Because Agent
                  Lucas' Decisions to Falsify Reports, Testify Falsely, and Suborn Perjury
                  Are Sufficiently Separable from the Discretionary Decision to
                  Prosecute  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

 .    II.    Mr. Westerfield's Malicious Prosecution Claim is Not Barred By the
           Intentional Torts Exception  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    III.    Contrary to the Defendant's Assertion, the Complaint Has Stated a Claim for
           Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           A.    Defendant Has Sufficient Notice of the Allegations Against It . . . . . . . . 19

           B.    The Pleading Standards Generally, Should This Court Restrict its Inquiry
                  to the Face of the Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           C.    Plaintiff's Complaint Ably Meets Those Standards  . . . . . . . . . . . . . . . . 22

V.      There is Sufficient Evidence to Defeat Summary Judgment . . . . . . . . . . . . . . . . 24

        A.      The Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . 24

        B.      Summary Judgment Should Be Denied As to Plaintiff's Malicious
                Prosecution Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                1.      The Proof Requirement for Malicious Prosecution Claims . . . . . 24

                2.      Plaintiff Has Sufficient Evidence to Support These Claims . . . . 26

                        a.      Lucas' False Testimony to the Grand Jury About Bray's
                                Reliability as a Witness . . . . . . . . . . . . . . . . . . . . . . . . . 26

                        b.      In Addition to Lucas' Lies Falsely Bolstering Bray's
                                Credibility, the Evidence Supports a Reasonable
                                Inference that Lucas Was Aware There Was No
                                Probable Cause that Mr. Westerfield Committed the
                                Drug Sales Alleged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

                        c.      By Testifying About Other Allegations Bray Made, that
                                Lucas Knew to Be False, Lucas Falsely Bolstered Bray's
                                Credibility Before the Grand Jury . . . . . . . . . . . . . . . . . . 32

        C.      Summary Judgment Should be Denied As to Plaintiff's Claims for
                Intentional Infliction of Emotional Distress . . . . . . . . . . . . . . . . . . . . . . 35

                1.      The Standards for Intentional Infliction of Emotional Distress
                        Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                2.      There is Sufficient Evidence for a Jury to Find that Lucas Knew
                        Bray was Framing Mr. Westerfield      . . . . . . . . . . . . . . . . . . . . . 35

                3.      The Evidence Creates an Issue of Material Fact About Whether
                        Lucas' Testimony to the Grand Jury Was Outrageous, Intended to
                        Cause Westerfield Emotional Distress, and Proximately Caused
                        Such Distress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        D.      Summary Judgment Should be Denied on the Conspiracy Claim . . . . . . . 3

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ii

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                                     <u>**PAGE**</u>

*Amini v. Oberlin College*, 259 F.3d 493 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Berkovitz v. United States*, 486 U.S. 531 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 16

*Bultema v. United States*, 359 F.3d 379 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Brown v. Matauszak*, 415 Fed. Appx. 608, 2011 WL 285251 (6th Cir. 2011) . . . . . . . . . . . . . . 23

*Castro v. United States*,  34 F.3d 106 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Chandler v. United States*, 875 F. Supp. 1250 (N.D. Tex.1994) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Coleman v. Beachwood*, 2009 WL 3387948 (Ohio App. 8 Dist.,2009) . . . . . . . . . . . . . . . . . . . 26

*Crow v. United States*, 634 F. Supp. 1085 (D.Kan.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Downs v. United States*, 522 F.2d 990 (6th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

*Edwards v. Tennessee Valley Authority*, 255 F.3d 318 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . 12

*Elkins v. Summit County, Ohio*, No. 5:06-CV-3004,
        2009 WL 1150114 (N.D. Oh., Apr. 28, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Erickson v. Pardus*, 551 U.S. 89 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 22

*Farag v. United States*, 587 F. Supp.2d 436 (E.D.N.Y., 2008) . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3rd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gardner v. United States*, 2011 WL 4537751 (6th Cir., September 30, 2011 ) . . . . . . . . . . . .  19

*General Dynamics v. United States*, *139 F.3d 1280 (9th Cir. 1998)* . . . . . . . . . . . . . . . . . . . . . . 15

*Gray v. Bell*, 712 F.2d 490 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

iii

*Gritton v. Disponett*, 332 Fed. Appx. 232,
2009 WL 1505256 (6th Cir., May 27,  2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gunasekera v. Irwin*, 551 F.3d 461 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hardesty v. Hamburg Twp.*, 461 F.3d 646 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hetzel v. United States*, No. 91–2986, 1993 WL 294794 (D.D.C.1993) . . . . . . . . . . . . . . . . .  13

*Heywood v. United States*, 585 F. Supp. 590 (D.Mass.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hunter v. Secretary of U.S. Army*, 565 F.3d 986 (6th Cir 2009)  . . . . . . . . . . . . . . . . . . . . . . . . 26

*Krieger v. Cleveland Indians Baseball Co.*, 176 Ohio App.3d 410,
892 N.E.2d 461(Ohio App. 8 Dist. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Limone v. United States*, 271 F. Supp. 2d 345 (D.Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Morales v. United States*, 1997 WL 285002 S.D.N.Y.,1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . 24

*New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, __ F.3d __,
2011 WL 2448909 (6th Cir. 2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Oliver v. Cleveland Indians Baseball Co. Ltd. Partnership*,
123 Ohio St.3d 278, 915 N.E.2d 1205 ( 2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Palm v. United States*, No. 5:05-cv-2667, 2006 WL 1735281
(N.D. Ohio, June 23, 2006) (J. Gwin) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Patel v. United States*, 806 F. Supp. 873 (N.D. Cal.1992)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pierson v. Aaron's Rental*, 2010 WL 4522425 (Ohio App. 10 Dist. 2010)  . . . . . . . . . . . . 25, 26

*Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 644 N.E.2d 286 (1994) . . . . . . . . . . . . . . . . .  35

*Pierce v. Woyma*, 2010 WL 4684722 (Ohio App. 8 Dist. 2010) . . . . . . . . . . . . . . . . . . . . . . 35, 37

*Reynolds v. United States*, 549 F.3d 1108 (7th Cir. 2008)  . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Stewart v. Moccasin Bend Mental Hosp.*, 2009 WL 2244621 (E.D.Tenn. 2009) . . . . . . . . . .  22

*Sutton v. United States*, 819 F.2d 1289 (5th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iv

*Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478 (6th Cir. 2009) . . . . . . . . . . . . . . . . . 21, 22

*Tarleton v. Meharry Medical College*, 717 F.2d 1523 (6th Cir.1983) . . . . . . . . . . . . . . . . . . 24

*Tri-State Hosp. Supply Corp. v. United States,* 142 F. Supp. 2d 93, (D.D.C. 2001) . . . . . . . . 15

*Trussell v. General Motors Corp.*, 53 Ohio St.3d 142, 559 N.E.2d 732 (1990) . . . . . . . . . . . 25

*Tucker v. Union of Needletrades, Industrial and Textile Employees*,
        407 F.3d 784 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 700 N.E.2d 859 (1998) . . . . . . . . . . . . . . . . . 37

*Wright v. United States,* 719 F.2d 1032 (9th Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Yellow Cab Co.*, 340 U.S. 543 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**STATUTES AND RULES**

18 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. § 1346(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 2680(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 2680(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

FED. R. CIV. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

FED R. CIV.P Rule 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FED. R. CIV. P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FED. R. CIV. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R.C. § 2921.13(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

**OTHER**

*5A Charles A. CR. Miller*, Federal Practice and
        Procedure § 1357 (2d ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## STATEMENT OF THE ISSUES

This case comes before the Court on defendant United States' Motion to Dismiss or Alternatively, for Summary Judgment. The issues before the Court are as follows:

(1)     Where plaintiff alleges injury from a DEA agent's intentional false case reporting, subornation of perjury at trial, and perjury before the Grand Jury, do such misdeeds violate the law, or are they instead protected "discretionary functions"?

(2)     Does the "intentional torts exception" to FTCA liability, which the United States admits does not protect federal law enforcement officers from malicious prosecution claims, nevertheless bar plaintiff's malicious prosecution claims based on a DEA agent's false testimony?

(3)     In light of plaintiff's properly pled complaint, as well as the evidence and documents in the record after nearly four years of litigation, has the defendant been given such inadequate notice of the allegations against it that dismissal under Rule 12(b)(6) is required?

(4)     Construing the evidence in the light most favorable to plaintiff, as must be done at this stage, is there sufficient evidence to defeat summary judgment on the issues of malicious prosecution, intentional infliction of emotional distress, and conspiracy?

## SUMMARY OF THE ARGUMENT

Plaintiff's evidence, which must be credited at this stage, establishes that long before DEA Agent Lee Lucas testified to the Grand Jury, he was well aware that his so-called confidential source, Jerrell Bray, was intentionally framing innocent people, using the controlled buys to steal money and drugs, and blatantly lying to cover his tracks.  Nevertheless, during the hearing to indict Jason Westerfield, Agent Lucas falsely assured the Grand Jury that the law enforcement officers were corroborating all of Bray's allegations, taking security measures to ensure that no such fraud was occurring, and verifying Bray's reliability.   A jury could reasonably conclude that Lucas' testimony was patently false.

In addition to falsely establishing Bray's credibility, Lucas provided the Grand Jury with the factual basis for several charges against Westerfield based on allegedly selling drugs to Bray on three separate occasions.  Lucas' testimony relied exclusively on Bray's claims that Westerfield sold him drugs.  Not only was there was no independent corroboration of Bray's allegations against Westerfield, as Lucas falsely claimed was standard protocol, but a jury could reasonably infer that Lucas was well aware that Westerfield wore a non-removable GPS device at the time of the supposed sales, and that device conclusively established that Westerfield was not present at the transactions, as Bray claimed.  Lucas' omissions and false testimony to the Grand Jury support claims for malicious prosecution and intentional infliction of emotional distress.  His joint efforts with Bray, federal agents Cross and Verhiley, and the other officers to hide their subterfuge surrounding Bray's frame-ups support a conspiracy claim.

Defendants' efforts to find procedural hurdles to these claims fall flat.  First, Lucas' intentional false case reporting, subornation of perjury at trial, and perjury before the Grand Jury

violate the law, so his conduct is not protected as "discretionary functions."  Second, the

"intentional torts exception" to FTCA liability does not bar plaintiff's malicious prosecution

claims because, as even the United States concedes, that exception does not protect federal law

enforcement officers.  Third, plaintiff's complaint is properly pled.  Moreover, the complaint can

be read in the context of the evidence and documents in the record, so there is no question that

the government has been given adequate notice of the allegations against it.  Finally, construing

the evidence in the light most favorable to plaintiff, there is sufficient evidence to defeat

summary judgment on the issues of malicious prosecution, intentional infliction of emotional

distress, and conspiracy.  Plaintiff concedes his false arrest and trespass claims.

## STATEMENT OF FACTS

### Background Information

In November 2007, Jason Westerfield filed a complaint under the Federal Tort Claims

Act ("FTCA") alleging that DEA agents conspired with Richland County law enforcement

officers to frame dozens of innocent people, including Mr. Westerfield, for drug crimes that they

did not commit.  (Doc. 1).  It has now come to light that law enforcement officers from Richland

County and the DEA and their confidential informant, Jerrell Bray, were framing people with

abandon:  using stand-ins to impersonate the accused, doctoring transcripts and audio recordings

to hide their subterfuge, filing false reports, signing untrue affidavits, intentionally

misidentifying people, perjuring themselves during the criminal trials, burying exculpatory

evidence, and turning a blind eye to their confidential source's blatant lies and criminal conduct.

(Doc. 144, Ct. Opinion, at 6-8, 19-21; Doc. 135-1, appendix of evidence in opposition to

summary judgment; Doc. 133, appendix of evidence in opposition to summary judgment).

Acting as a confidential source for Richland County (before the DEA began its involvement in the investigation), Bray claimed that he made three crack cocaine purchases from Mr. Westerfield personally in February and March 2005.  (Exhibit B, USA001-010840-41, 10832-35, 10840-41, 10856-57, 11392-94).  There is nothing in any of the reports suggesting that the investigating officers made any effort to corroborate Bray's accusations or even to confirm that Westerfield was present at the house where the transactions supposedly occurred.  (*Id.*).  In fact, the officers were aware that Mr. Westerfield was wearing a GPS device during the time of the alleged sale, and the GPS device conclusively established that Mr. Westerfield was not present for the alleged buys.  (Exhibit B at USA001-010890-940, 010856-57, 11491-514).

As a result of defendants' conspiracy, Mr. Westerfield was indicted along with twenty-one other individuals and was tried alongside numerous co-defendants.  (Doc. 133, Ex. 8).  In one additional count of the indictment, Count 30, Westerfield was charged with drug possession with intent to distribute, and that charge had nothing to do with Bray.  (*Id.*).  At trial, it became readily apparent that Mr. Westerfield was framed for the drug sales attributed to him, and he was not convicted of any charge stemming from the sales falsely pinned on him by Bray.  Only Count 30 (the non-Bray charge) resulted in a conviction.  (Doc. 133, Exhibits 8 and 9).  This conviction was later vacated on the government's motion because the conviction was wholly reliant on Detective Metcalf's testimony, and Metcalf's credibility was shot when he admitted that he perjured himself during Westerfield's trial, falsely identifying a co-defendant charged in a separate count.  (Doc. 133, Ex. 9; Doc. 125, Ex. 12(J); Doc. 144, Ct. Opinion, at 21).

On November 12, 2010, the FTCA complaint in this case was consolidated with the *Bivens* case Mr. Westerfield brought against all of the culpable officers, alleging numerous

§1983 violations and state law claims.  (Doc. 116).  After much litigation, this Court granted in part and denied in part the defendants' motions for summary judgment based on qualified immunity as to certain § 1983 and state law claims.  (Doc. 144).  Defendants Lucas and Metcalf appealed that ruling, and that appeal is currently pending in *Westerfield v. United States*, Case Nos. 11-3607, 11-3608.  Now, in this motion, the United States seeks dismissal of the FTCA claims.  Plaintiff maintains that his claims for malicious prosecution, intentional infliction of emotional distress, and conspiracy should be permitted to proceed.

### DEA Agent Lee Lucas' False Reporting and Perjury Before the Grand Jury Caused Mr. Westerfield's Indictment

Agent Lucas testified before the Grand Jury to secure Mr. Westerfield's indictment. (Exhibit A, Lucas Grand Jury testimony).  Lucas' testimony against Mr. Westerfield regarding the alleged drug sales was entirely reliant on Bray's accusations – Lucas did not suggest that any other officer witnessed or had personal knowledge of the alleged transactions, and the investigation reports suggest that there was no corroboration of Bray's allegations against Mr. Westerfield.  (Exhibit A at USA001-000018-20; Exhibit B at USA001-010840-41).  During Lucas' testimony, he assured the Grand Jury of Bray's reliability and informed the Grand Jury of all of the steps the law enforcement officers routinely took in each investigation to corroborate Bray's accusations and ensure that Bray's allegations were honest and accurate.  (Exhibit A at USA001-000012-16).

However, there is mounds of evidence suggesting that before Agent Lucas testified to the Grand Jury, he was well aware that rather than being a reliable informant, Bray was cheating, lying, and stealing during the controlled buys he conducted for the government, but Lucas hid the misdeeds through blatantly false reporting.  Additionally, the evidence indicates that the

5

officers did not take the steps to corroborate Bray that Lucas claimed were standard procedure.

Lucas did not reveal any such information to the Grand Jury.  (Exhibit A).  The evidence also

supports that Lucas was aware that the other officers, including Detective Metcalf, were in on

the fix, but again Lucas did not inform the Grand Jury that the investigation had been

compromised.

 To those ends, plaintiff's evidence supports that before Lucas testified to the Grand Jury,

he was aware of the following:

- Lucas was personally aware that Bray was stealing money from the government during
controlled buys, but Lucas lied in his DEA-6 reports to hide that information.  (Doc. 133,
¶¶ 12-13).  For instance, Lucas actually caught Bray stealing money during the controlled
buy falsely attributed to Westerfield co-defendant, Noel Mott.  Bray claimed that he
called Mott to stage a deal, but he actually called his buddy, Darren Transou.  (Exhibit B,
USA001-002843, 002919).  During that deal, Bray paid Transou $1620 for the drugs, and
afterwards counted out the balance of the money given to him by the officers ($780),
forgetting that the officers were still recording him and could hear him counting the
remaining money.  (Exhibit C, Lucas Trial Tr., at 392-95).  Bray then hid the $780
balance in a secret compartment in his car behind the radio, intending to steal the money.
(Exhibit C, Bray testimony, at 212-14).  Bray told the officers that he gave Mott all of the
money given to him for the buy, plus $20 of Bray's own money.  After the hidden $780
was found in Bray's car, instead of busting Bray for stealing, Lucas wrote in his report
that Bray returned all of the money.  (Doc. 133, ¶ 12; Exhibit B, USA001-002843-44).
Lucas never documented Bray's attempted theft.  (*Id.*).

- Lucas was also aware that Bray stole thousands of dollars during the alleged Dwayne
Nabors transaction.  (Doc. 133, ¶¶ 38-39).  These incidents are consistent with Bray's
testimony that Lucas was personally aware that Bray stole money while acting as an
informant, and Lucas gave Bray tacit permission to do so.  (Doc. 133, ¶ 13).  All of these
theft incidents occurred before Lucas testified to the Grand Jury.

- Lucas saw the same stand-in impersonate multiple alleged perpetrators, but his reports
failed to divulge the ruse.  (Doc. 133, ¶¶ 28, 42).  In a transparent charade, Lucas saw
Bray use Darren Transou to impersonate both Noel Mott and Lowesco Ballard.  (Doc.
133, ¶ 42).  For the Ballard frame-up, Bray claimed to have called Ballard at a specific
phone number to set up the deal, but his phone records show that he never actually called
the claimed phone number.  (Exhibit B, USA001-000977-979, 002833).  According to
the transcripts, whoever Bray did call did not know where Eastgate Apartments or
Ashland Road were, but Ballard lived less than two miles away from those spots his

whole life and certainly would not have needed to call Bray repeatedly for directions. (Exhibit B, USA001-005215-18, 000337-40).  The person impersonating Ballard also referred to him in the third person, but Lucas changed the transcripts to hide that fact. (Doc. 133, ¶¶ 45-57).  Transou, who had a medium build and wore his hair in braids, looked nothing like the distinctive looking Ballard, who was 6'5", very skinny, and always wore his head shaved.  (Doc. 133, ¶ 43).  A jury could reasonably infer from this evidence that before he testified to the Grand Jury, Lucas was aware of Bray's use of stand-ins to frame innocent people.

- Along that same vein, there is evidence that Lucas knew Bray used the same stand-in, Robert Harris (who even wore the same shirt in both roles), to impersonate both Roosevelt Williams and Johnny Robertson.  (Doc. 133, ¶ 28).  Moreover, during the purported Williams deal, Lucas saw the dealer arrive Bray's car, a car Lucas saw Bray use during the alleged Nabors deal.  (Doc. 133, ¶ 29).  After Officer Ansari ran the license plate of the car and confirmed that it was Bray's, Lucas generated a second DEA-6 report, changing the make of the car to hide this fact.  (Doc. 133, ¶ 30).  Lucas commented on the fact that the alleged dealer drove Bray's car back to Bray's house after the deal, but failed to document this revealing fact in his report.  (Doc. 133, ¶ 31).  Detective Perry Wheeler was very familiar with Williams and informed Lucas that the perpetrator identified was definitely not Williams (who is tall, thin, and light-skinned, in contrast to the impersonator, who was short, dark-skinned, and stocky).  (Doc. 133, ¶¶ 22-24).  Lucas not only omitted Wheeler's observations and opinion from the report, his report omitted Wheeler's presence at the scene altogether.  (Doc. 133, ¶ 26).  Thus, a jury could conclude that, prior to his Grand Jury testimony, Lucas knew of and assisted Bray's efforts to frame innocent people.

- Bray also used Robert Harris as an audio stand-in for Danny Brown.  After thirty phone call attempts, Bray was unsuccessful in getting Brown to commit to a deal, so Bray just called Robert Harris, at Harris' known number, and set the deal with him, claiming it was Brown.  (Doc. 133, ¶¶ 53-56).  At his own criminal trial, Lucas testified that it was raining too hard to see the deal participants during the alleged Danny Brown deal, but Lucas nevertheless falsely testified in support of Bray's identification at Brown's criminal trial.  (Doc. 133, ¶ 62).  Thus, there is evidence creating a dispute of fact that Lucas was aware of Bray's false claims and his use of stand-ins to frame innocent people well before the Grand Jury testimony.

- Lucas falsely backed Bray's identification of Dwayne Nabors during one deal, when according to Detective Metcalf, this identification was a lie, and according to the prosecutor, there was "a vast difference" between Nabors' physical appearance and the appearance of the person who admitted to being the actual perpetrator.  (Doc. 133, ¶¶ 34-35).  In furtherance of his and Bray's false identification, Lucas lied to the prosecutor, telling him there was no video tape of this deal, when in fact Lucas was present during the videotaping.  (Doc. 133, ¶ 36).  Lucas' initial false identification occurred before his Grand Jury testimony.

- Lucas was present and "never let Bray out of his sight" when Bray's girlfriend brought him the drugs that Bray then claimed Joe Ward sold to him. (Doc. 133, ¶¶ 63, 65). The drug hand-off was also captured on the audio recording of the fake deal. (Doc. 133, ¶ 64). When Bray falsely testified that Ward had sold him the crack that his girlfriend had actually given him (and presumably, Bray pocketed the buy money), Lucas testified that he specifically watched for a drug hand-off, but it never happened. (Doc. 133, ¶¶ 65-66)

- Bray was arrested for drug possession while acting as an informant when he tried to embezzle some of the drugs he had purchased in the controlled buy by hiding them behind his steering wheel. This fact was never included in any report. (Doc. 135-1, ¶¶ 22-25). Specifically, on March 31, 2005, two weeks after Bray fingered Westerfield, Bray was arrested and charged with possessing crack cocaine that he hid behind his steering wheel during a controlled buy for the government. (Doc. 135-1, ¶ 22-25; Exhibit C, Lucas Trial Tr. 371-74). Bray initially told Detective Metcalf "somebody dropped it off to me, and I put it in my steering wheel and I couldn't do nothing with it because I was at work." (Exhibit C at 373). Then Bray changed his story and said that the drugs belonged to his girlfriend, Alexis Younger. (Exhibit C at 373-74). Despite the ever-changing story, Metcalf intervened and arranged for the criminal case to be dismissed. (Doc. 135-1, ¶ 24). Younger was never arrested or charged. (Doc. 135-1, ¶ 22).

- Lucas and the other officers did not confirm any of the suspects' addresses or do anything to corroborate Bray's claims about deals taking place in suspects' homes (Doc. 133, ¶ 16). Although Detective Metcalf supposedly supervised all of Bray's telephone calls, Lucas was aware that neither he, Metcalf, nor the other officers watched Bray dial suspects' telephone numbers, dialed for him, or verified on his phone screen what numbers he was actually calling. (Doc. 133, ¶ 18, Doc. 135-1, ¶ 17-18). Lucas and the other officers also overlooked discrepancies in the drug weight amounts Bray claimed to purchase, allowing Bray to steal the difference without documentation. (Doc. 133, ¶ 19).

- Lucas heard sworn testimony at a proffer about Bray dealing his own drugs on the side, but Lucas DEA-6 report of the proffer omitted that revelation.  (Doc. 133, ¶ 20).

    Thus, there is far more than enough evidence to create a dispute of fact establishing that before Agent Lucas testified to the Grand Jury, he was aware that Bray was stealing and framing people.  Despite all of this evidence, in order to secure an indictment against Mr. Westerfield, Agent Lucas falsely informed the Grand Jury that Bray was a stellar informant, omitting and lying about Bray's deficiencies.  Although nothing could be further from the truth, Lucas told the Grand Jury:

> [W]hen we made the controlled purchase, basically what we're doing is trying to corroborate the information from the informant.  We search the informant, make sure that the informant doesn't have any drugs or money.  We also search the informant's vehicle, to make sure the informant doesn't have any drugs or money.  We placed tape recorded telephone calls to these people. . . .We also made recordings of the purchases.  We surveilled the purchase. . . .we recover the drugs, recover the recording device, search the informant and the vehicle again, to make sure they didn't pull a piece off for themselves, they didn't keep some of the buy money, pull a piece off.  It is all to corroborate the informant.

(Exhibit A, USA001-000012-15).  As a result of Lucas' testimony, Mr. Westerfield was indicted for allegedly selling drugs to Bray and being a member of a conspiracy to sell drugs.  (Doc. 133, Exhibit 8).

### Westerfield's Conviction for Count 30

Westerfield was convicted on Count 30 of the superseding indictment, the one Count not related to Bray.  This count purportedly related to intercepted telephone calls Westerfield made from prison and the subsequent discovery of drugs in the home of Jacquoia Ginn that were attributed to him.  (Doc. 144, Ct. Opinion, at 4).  At the criminal trial, Detective Metcalf was the only officer who testified about this charge, and it was his testimony alone that established that officers executed a search warrant, searched a house, and found actual drugs.  As the prosecution later conceded, without Metcalf's testimony, there would not have been a conviction.  (Doc. 125, Ex. 12(J), Govt.'s response to Petitioner's Motion to Vacate Conviction and Sentencing Pursuant to 18 U.S.C. § 2255).  Accordingly, this Court found, "Metcalf was a material witness in Westerfield's prosecution."  (Doc. 144, Ct. Opinion, at 21).

This Court found that there is evidence establishing that Detective Metcalf perjured himself during Westerfield's trial when Metcalf  falsely identified co-defendant Nabors as a perpetrator, even though the actual perpetrator looked nothing like Nabors.  (Doc. 144, Ct.

9

Opinion, at 19).  Metcalf has pled guilty to charges arising from his presentation of false evidence during Westerfield's trial as to co-defendant Nabors.  (Doc. 144 at 8).  This Court found sufficient evidence to support that Metcalf and Lucas also both lied to the prosecutor and said that no videotape of the transaction existed, when Metcalf himself had videotaped the deal.  (Doc. 144 at 19).  Additionally, Metcalf now admits that Lucas' case report for the deal had untrue statements in it attributed to him.  (Doc. 144 at 19).  Metcalf admits that he perjured himself in order to make his testimony consistent with Lucas' false case report.  (Doc. 144 at 19).

This Court found sufficient evidence to support plaintiff's allegation that Lucas sat silently at the prosecutors' table, as part of the prosecution team, while Metcalf perjured himself during the criminal trial.  (Doc. 144, Ct. Opinion, at 7).  Although Lucas was undoubtedly aware that Metcalf's testimony was false, he did nothing to address the perjury and instead perjured himself as well.  (Doc. 144 at 19-20). This Court held that there was ample evidence supporting that Lucas knew Metcalf perjured himself since many of Metcalf's lies either involved Lucas or were bolstered by Lucas' false claims.  (Doc. 144 at 20).  This Court concluded, "[T]he evidence suggests that defendant Lucas knew that Metcalf lied during the trial regarding Nabors, thereby perjuring himself.  As defendant Metcalf was a material witness in Westerfield's prosecution, defendant Lucas possessed *Brady* material, which should have been disclosed to the prosecutor."  (Doc. 144 at 21).

10

**ARGUMENT**

**I.     DEA Agent Lee Lucas' Perjury to Secure Mr. Westerfield's Indictment, Lucas'
        Intentional False Reporting, and His Subornation of Perjury Are Not Protected
        Discretionary Functions**

     **A.     An Explanation of the Discretionary Functions Exception**

The Federal Tort Claim Act ("FTCA") is a broad waiver of the United States' sovereign

immunity from tort liability, allowing individuals to sue the United States for the negligent or

wrongful act of government employees acting in the scope of their employment, "if a private

person would be liable . . . in accordance with the law of the place where the act or omission

occurred."  28 U.S.C. § 1346(b)(1).

However, the government's waiver of sovereign immunity for FTCA claims is subject to

the discretionary function exception.  Under this exception, the waiver does not apply to:

> Any claim based upon an act or omission of an employee of the Government, exercising
> due care, in the execution of a statute or regulation, whether or not such statute or
> regulation be valid, or based upon the exercise or performance or the failure to exercise
> or perform a discretionary function or duty on the part of a federal agency or an
> employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a); *see also Bultema v. United States*, 359 F.3d 379, 383 (6th Cir. 2004).

The Supreme Court in *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), explained

that the rationale behind the discretionary function exception is to "prevent judicial

'second-guessing' of legislative and administrative decisions grounded in social, economic, and

political policy through the medium of an action in tort.  The exception, properly construed,

therefore protects only governmental actions and decisions based on considerations of public

policy."  *Id*. at 536-37 (internal quotation marks and citation omitted).

The law is clear that the discretionary function exception does not apply "when a federal

11

statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Bultema*, 359 F.3d at 384, *quoting Berkovitz*, 486 U.S. at 536; *see also Edwards v. Tennessee Valley Authority*, 255 F.3d 318, 322-23 (6th Cir. 2001) (when there is a statute, rule or mandatory policy, then "the discretionary function exception does not apply because there was no element of judgment or choice in the complained of conduct) (internal quotation marks and citation omitted).

**B.      The Sixth Circuit Has Determined that the Duties of Law Officers are Generally Not Protected as Discretionary Functions**

The Sixth Circuit has found that the actions of law enforcement officers are generally not discretionary and therefore not protected by sovereign immunity. *See Downs v. United States*, 522 F.2d 990, 997-98 (6th Cir. 1975).  In *Downs*, an FTCA claim was brought against the United States based on FBI agents' negligent handling of a hijack situation. *Id.* at 994.  The court explained that the mere exercise of judgment is not what entitles the government to invoke the exception, as "[j]udgment is exercised in almost every human endeavor," and if exercise of judgment were the standard, "a host of cases have been wrongly decided." *Id.* at 995.

After careful consideration of the legislative history and commentary surrounding the discretionary function exception, the Sixth Circuit found, "Congress intended 'discretionary functions' to encompass those activities which entail the formulation of governmental policy, whatever the rank of those so engaged." *Id* at 997.  Because the special agent responding to the hijacking in *Downs* was not making policy in responding to the particular situation, the discretionary function exception did not apply. *Id.*  The court expressly rejected the government's argument that "a law enforcement officer choosing among various available methods of enforcing the law in a given situation is performing a discretionary function under

12

the Act." *Id.*

The *Downs* court explained that the policy purposes behind the discretionary function exception did not apply in cases of law enforcement officers' conduct; rather, "[t]he need for compensation to citizens injured by the torts of government employees outweighs whatever slight effect vicarious government liability might have on law enforcement efforts." *Id.* at 998. The court eloquently concluded, "We believe that Congress intended that this action be tried in the courts, not in the halls of Congress.  To decide otherwise would be to ignore the 'sweeping language' of the Act, the 'general trend toward increasing the scope of the waiver,' and the need to avoid 'whittl[ing] it down by refinements.'" *Id.* at 998, *quoting United States v. Yellow Cab Co.*, 340 U.S. 543, 547 (1951).

The Sixth Circuit is not alone in holding that the conduct of law enforcement officers is generally not entitled to immunity under the discretionary functions exception.  *See, e.g., Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir.1987) (reversing dismissal because investigative agent's suppression of favorable evidence and manipulation of other evidence may well fall outside discretionary function exception); *Hetzel v. United States*, No. 91–2986, 1993 WL 294794, *3 (D.D.C.1993) (in FTCA action, DEA agents' misconduct in pursuing suspect was not  within the discretionary function exception); *Patel v. United States*, 806 F. Supp. 873, 878 (N.D. Cal.1992) (discretionary function exception did not bar FTCA action based on DEA agents' conduct during execution of search warrant).

Here, Mr. Westerfield has considerable evidence showing that DEA agent Lee Lucas concocted numerous false reports hiding Bray's, the investigating officers', and particularly Officer Metcalf's duplicity as a witness.  Lucas also testified falsely in order to secure the

13

indictment against Mr. Westerfield.  Under *Downs*, the discretionary function exception simply does not apply to such actions, so sovereign immunity does not bar any claims based on this misconduct.

### C.  The Discretionary Function Exception Does Not Apply Because Agent Lucas' Decisions to Falsify Reports, Testify Falsely, and Suborn Perjury Are Sufficiently Separable from the Discretionary Decision to Prosecute

Courts around the country agree that when a federal officer issues false reports, suborns perury, and/or gives false testimony, such conduct is well beyond the intent of the discretionary functions exception, and the exception's protection simply does not apply.  *See, e.g., Chandler v. United States*, 875 F. Supp. 1250, 1265-66 (N.D. Tex.1994) ("without exception, courts have held that an investigative agent's giving of false testimony to a grand jury is not immune as a discretionary function."); *Morales v. United States*, 1997 WL 285002 S.D.N.Y.,1997, *1 (allegations that the DEA agents arrested plaintiffs without probable cause and contributed to their prosecution by giving false and misleading testimony are facially sufficient to make out a claim of "discrete activity" that is "sufficiently separable" from the decision to prosecute as to fall outside the discretionary function exception); *Crow v. United States*, 634 F. Supp. 1085, 1089 (D.Kan.1986) ("to the extent plaintiff claims that the postal inspectors falsified their memoranda and reports and gave false testimony to bring about plaintiff's prosecution, we hold that these claims are not barred by the discretionary function exception"); *Heywood v. United States*, 585 F. Supp. 590, 591 (D.Mass.1984) (FTCA claim that the postal inspector testified falsely before the Grand Jury is not barred by the discretionary function exception); *Limone v. United States*, 271 F. Supp. 2d 345, 356 (D.Mass. 2003) (rejecting argument that law-enforcement officers had discretion to suborn perjury or falsify evidence); *Tri-State Hosp.*

14

*Supply Corp. v. United States*, 142 F. Supp. 2d 93, 100-01 (D.D.C. 2001) ("With respect to

Tri-State's claims that Customs officials falsified records and lied to bring about a prosecution, .

. . [l]ying under oath to preserve barred claims is not a protected act under the discretionary

function exception."), *rev'd on other grounds*, 341 F.3d 571 (D.C.Cir. 2003); *Wright v. United

States*, 719 F.2d 1032, 1035 (9th Cir.1983) (agent's testimony before the grand jury is not

immune as a discretionary function).

　　In support of their immunity claim, defendant relies on three readily distinguishable

cases:  *General Dynamics v. United States*, 139 F.3d 1280 (9th Cir. 1998); *Gray v. Bell*, 712 F.2d

490 (D.C. Cir. 1983); and *Palm v. United States*, No. 5:05-cv-2667, 2006 WL 1735281 (N.D.

Ohio, June 23, 2006) (J. Gwin) (Doc. No. 154-1 at 15-26).  Each of these three cases involved

allegations of negligent conduct by the government officers, not intentional conduct like fraud,

manufacturing false evidence, suborning perjury, and perjury.  *See General Dynamics*, 139 F.3d

at 1282 (claims based on auditors' report that was negligently prepared); *Gray*, 712 F.2d at 492-

93 (complaint alleged a grossly negligent investigation); and *Palm*, 2006 WL 1735281 at *1

(plaintiff alleged that the Administration negligently pursued litigation against him).

　　Defendant's reliance on these cases is misplaced because the case law makes it clear that

the nature of the conduct alleged here – intentional fraud, false reporting, suborning perjury, and

perjury, rather than a mere mistake or negligence – renders Agent Lucas' conduct outside of the

discretionary function exception.  There can be no argument that perjury and intentional false

reporting is the sort of "legislative and administrative decisions grounded in social, economic,

and political policy" that "Congress wished to prevent judicial 'second-guessing' of" with the

discretionary functions exception.  *Berkovitz*, 486 U.S. at 536.

15

This distinction was carefully explored in *Reynolds v. United States*, 549 F.3d 1108 (7th Cir. 2008).  In *Reynolds*, the plaintiff conceded that the actual decision to prosecute her was discretionary, but argued that the government was liable under the FTCA because the law officer's conduct, in "providing knowingly false information *en route* to a criminal prosecution is 'sufficiently separable' from the 'protected discretionary decision.'" *Id*. at 1113.  At oral argument the court asked the government "whether a law-enforcement officer involved in a criminal investigation has discretion to report information that the officer knows to be false."  *Id.*  As the government maintains here, the defendant in *Reynolds* argued that such conduct is protected as a discretionary function, citing *Gray*.  *Id.*  The court emphatically rejected that argument as a clear misreading of *Gray.  Id.*

The *Reynolds* court explained that in *Gray*, the court held that allegations that the prosecutors failed to call certain witnesses before a grand jury, omitted mention of exculpatory evidence, and misrepresented dates in a time line of criminal activity are allegations that are not sufficiently separable from the prosecutors' protected discretionary function.  *Reynolds*, 549 F.3d at 1113, *citing Gray*, 712 F.2d at 494, 513-16.  Because the alleged misconduct in *Gray* was "inextricably tied to the decision to prosecute and the presentation of evidence to the Grand Jury," and there was "no meaningful way in which the allegedly negligent investigatory acts could be considered apart from the totality of the prosecution," the discretionary function exception applied there.  *Reynolds* at 1113, *citing Gray* at 516.

But the court distinguished *Gray* from the situation presented in *Reynolds*, which has substantially identical allegations to the claims here (in both cases, the officers are accused of falsifying reports and giving false testimony to cause the prosecution).  Specifically, the court

16

held:

> The case before us is distinguishable, however. *Gray* proposes that if the decision to prosecute is discretionary, so too are the many small decisions that accompany a prosecution – how much evidence to present, whether to call certain witnesses, etc. – even if those decisions inadvertently mislead a grand jury. . . . But this is an altogether different scenario. Reynolds alleges that Lambert and Fullerton fueled her prosecution with knowingly false information. And how can that be a discretionary decision when it is proscribed by Indiana law? It cannot; a federal investigator's decision to lie under oath is separable from the discretionary decision to prosecute.

*Reynolds*, 549 F.3d at 1113 (internal citations omitted).

Lucas' conduct in falsifying reports and testifying falsely before the Grand Jury are

similarly barred by law and therefore fall outside the discretionary function exception. Ohio law

provides:

> No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies:
>
> (1)   The statement is made in any official proceeding;
> (2)   The statement is made with purpose to incriminate another;
> (3)   The statement is made with purpose to mislead a public official in performing the public official's official function
> . . . .
> (6)   The statement is sworn or affirmed before a notary public or another person empowered to administer oaths.
> (7)   The statement is in writing on or in connection with a report or return that is required or authorized by law.

*See* R.C. § 2921.13(A). Because the law unequivocally prohibits a law enforcement officer from

issuing intentionally false reports and giving false testimony to the Grand Jury in order to secure

an indictment, Agent Lucas' lies cannot be considered discretionary conduct.

Defendant erects and defeats a straw man in Argument 1(B) of its motion, where it

maintains that the prosecutors' decisions were discretionary and therefore protected functions.

(Doc. 154-2 at 26). Mr. Westerfield recognizes that prosecutorial decisions are protected

discretionary acts, but Agent Lucas' intentional false reporting, subornation of perjury at trial, and perjury to the Grand Jury are sufficiently separable from the prosecutors' functions, so that the exception does not apply.  Defendant's cited cases about challenging the quality of an investigation generally have no bearing here, where Mr. Westerfield is not claiming that the investigation was merely sloppy, inadequate or negligent; rather, he is accusing Agent Lucas of intentional false reporting and suborning and committing perjury.

In sum, the government cannot claim sovereign immunity for Agent Lucas' misdeeds under the discretionary function exception.  Lucas' misconduct violated the law, was in no way discretionary, and goes well beyond the type of actions that the exception is designed to protect.

## II.  Mr. Westerfield's Malicious Prosecution Claim is Not Barred By the Intentional Torts Exception

The government acknowledges that federal law enforcement officers are not protected from malicious prosecution by the intentional torts exception.  (Doc. 154-1 at 37).  The law provides that "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law," can be liable for malicious prosecution under 28 U.S.C. § 2680(h).  (Doc. No. 154-1 at 29-30).  DEA Agent Lucas squarely fits this description and can therefore be liable for malicious prosecution.

Even though the complaint and the evidence presently available support Agent Lucas' egregious misconduct, forming the basis for a malicious prosecution claim, the government argues that plaintiff's claims "are really challenges to the prosecutor's actions," and thus are barred by immunity.  *Id.*  This conflation is without legal basis and defies logic.  Mr. Westerfield does not allege that the prosecutors are the source of the malicious prosecution.  Rather, it is Agent Lucas' intentionally false reporting and false testimony to the grand jury that provides the

18

basis for this claim.  Because, as the government concedes, Lucas' conduct is not barred by the intentional torts exception, this claim should be allowed to go forward.

III.    **Contrary to the Defendant's Assertion, the Complaint Has Stated a Claim for Conspiracy**

      A.    **Defendant Has Sufficient Notice of the Allegations Against It**

It is incongruous at this juncture for the government to argue that it does not have sufficient notice of the allegations against it.  In ruling on a 12(b)(6) motion to determine the adequacy of the complaint, this Court is free to consider the pleadings and evidence already in the record to determine whether the defendant has adequate notice of the nature of the allegations.  *See, e.g., Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (in determining whether to grant a Rule 12(b)(6) motion, the court may take into account matters of public record and items appearing in the record of the case); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed. 1990) ("In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account."); *Gardner v. United States*, 2011 WL 4537751, *3 (6th Cir., September 30, 2011 ) (same).  This allowance for flexibility makes perfect sense:  Rule 12(b)(6) is designed to ensure that the defendant has notice of the allegations against it, not to promote gamesmanship about the contents of the complaint.

At this point, almost four years after the complaint was filed, the defendant has had ample notice of the allegations against it.  Summary judgment has been fully briefed in this case, not once but twice.  An appeal of the Court's summary judgment ruling has also been fully briefed twice.  Although plaintiff has only been afforded minimal discovery at this juncture,

there is still evidence delineated in the record and pleadings, including sworn testimony as well as transcripts, case reports, and other documents, spelling out precisely what types of misconduct Agents Lucas, Cross, and Verhiley are alleged to have committed and how such conduct supports liability for conspiracy. *See, e.g.,* Doc. 132 (Plaintiff's Response to Lucas' Motion for Summary Judgment); Doc. 133 (Appendix of Evidence in Opposition to Summary Judgment); Doc. 135-1 (Appendix of Evidence in Opposition to Summary Judgment).

To hold that the government still does not have adequate notice of the allegations against it would be form over substance in the extreme. These claims have been pending for nearly four years, and the government's belated assertion that they are inadequately pled should be rejected.

### B. The Pleading Standards Generally, Should This Court Restrict its Inquiry to the Face of the Complaint

Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), allegations in a complaint need only "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Hunter v. Secretary of U.S. Army*, 565 F.3d 986, 992 (6th Cir 2009) (citations omitted). *Iqbal* and *Twombly* provide, "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949, *citing Twombly*, 550 U.S. at 570.

Under *Twombly*, "[t]he factual allegations in a complaint need not be detailed; they 'need only give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Gritton v. Disponett*, 332 Fed. Appx. 232, 236-37, 2009 WL 1505256, *3 (6th Cir., May 27, 2009), *quoting Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3rd Cir. 2009) (a complaint need not be "as rich with detail as some might

prefer[;] it need only set forth sufficient facts to support plausible claims."). Under *Twombly*, "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.] Factual allegations must be enough to raise a right to relief above the speculative level. . . ." *Twombly*, 550 U.S. at 555 (internal citations omitted).

The governing Rule for pleading a complaint is Federal Rule of Civil Procedure 8, which states, "A pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). After *Twombly*, Rule 8 has remained "a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009), *quoting Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002); *see also Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009); *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

Immediately after *Twombly* the Supreme Court decided *Erickson v. Pardus*, 551 U.S. 89, 93 (2007), which reaffirmed that the pleading requirements are aimed at giving defendants sufficient notice of the claims against them. In *Erickson*, the Supreme Court held, "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* (internal quotation marks and citation omitted) (omission in original); *see also Tackett*, 561 F.3d at 488 , *quoting Erickson*, 127 S.Ct. at 2200 ("Just weeks after the *Twombly* decision, however, the Supreme Court . . . reaffirm[ed] the liberal pleading standard in Rule 8(a)(2): . . . requir[ing] only a 'short and plain statement of the claim showing that the pleader is entitled to relief.'").

21

After *Erickson*, in *Iqbal*, the Court clarified that a court need not accept as true "legal conclusions[, or t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S.Ct. at 1950-51.  The Court in *Iqbal* was "admonishing those plaintiffs who merely parrot the statutory language of the claims that they are pleading (something that anyone could do, regardless of what may be prompting the lawsuit), rather than providing some specific facts to ground those legal claims, that they must do more" to comply with Rule 8.  *Brooks*, 2009 WL 2535731 at *5.  These requirements are more than met here.

## C.   Plaintiff's Complaint Ably Meets Those Standards

The allegations in the complaint certainly suffice as a "short and plain statement of the claim showing that the pleader is entitled to relief."[1]  FED. R. CIV. P. 8(a)(2).  The complaint alleges:

> In order to build a false case against him, the Defendants fabricated evidence which falsely implicated Mr. Westerfield in the drug ring, and destroyed and/or otherwise withheld from the prosecutors and from Mr. Westerfield evidence which would have helped exonerate him, all in violation of the constitution.
> In so doing, the Defendants, acting personally, as well as by and through conspiracy with others, coached and manipulated witnesses, and then withheld from the prosecutors the details of how they had done so.
> . . . Defendants deprived Mr. Westerfield of due process by manipulating and tampering with evidence in an effort to falsely implicate and convict Mr. Westerfield.
> As a result of the aforementioned wrongful conduct, Mr. Westerfield was wrongfully arrested, indicted, and tried for a crime he did not commit.

---

[1] Because this case has been consolidated with the *Bivens* action against the same defendants, the two complaints should be considered together in evaluating the sufficiency of the pleadings.  *See, e.g., Stewart v. Moccasin Bend Mental Hosp.*, 2009 WL 2244621 (E.D.Tenn. 2009) (after consolidation of two related matters, the court considered the separate complaints together as a consolidated complaint to determine the sufficiency of the pleadings); *Bollers v. BAC Home Loan Servicing, LP*, 2010 WL 3190629 (N.D.Ga. 2010) (considering plaintiff's three complaints together after consolidation).  Should the Court have any concerns about the sufficiency of this complaint, the *Bivens* complaint provides even more detail.

22

(Doc. 1, ¶¶ 13-15, 17).  These allegations are more than threadbare recitations of the statutory elements.  Instead the complaint specifies what conduct by the defendants' agents supports liability for conspiracy – fabricating evidence, destroying exonerating evidence, manipulating witnesses, and tampering with evidence in order to wrongfully arrest, indict, and try Mr. Westerfield for crimes he did not commit.

Finally, if this Court were to find that the FTCA complaint should be read in a vacuum, without consideration of the *Bivens* complaint, the summary judgment pleadings and evidence, or any other document of public record or in this case, plaintiff would respectfully ask for an opportunity to amend his complaint.  *See Brown v. Matauszak*, 415 Fed. Appx. 608, 616, 2011 WL 285251, *8 (6th Cir. 2011) (in light of seriousness of the allegations and state court documents suggesting that information existed that would cure the complaint's defects, plaintiff should be given an opportunity to amend his complaint); FED. R. CIV. P. 15(a)(2) (district courts should "freely give leave" to amend a complaint  when justice so requires); *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, __ F.3d __,  2011 WL 2448909, *5 (6th Cir. 2011) (Rule 15(a) authorizes the court to freely grant leave to amend when there is no "undue delay, bad faith, or dilatory motive on the part of the movant.").

## V.      There is Sufficient Evidence to Defeat Summary Judgment

### A.      The Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 546 (6th Cir. 2008); FED. R. CIV. P. 56(c).  The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Nance*, 527 F.3d at 547, *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  When deciding a motion for summary judgment, a court must view the evidence in favor of the non-moving party and draw all reasonable inferences in that party's favor. *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 650 (6th Cir. 2006), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Plaintiff urges this Court to defer ruling on summary judgment until after allowing discovery on the factual basis for his claims.  The well-established rule in this Circuit is that summary judgment on a factual issue may not be adjudicated until the plaintiff has had an opportunity for discovery. *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005).  This requirement "is particularly strong when constitutional and civil rights claims are at issue."  *Tarleton v. Meharry Medical College*, 717 F.2d 1523, 1535 (6th Cir.1983) (citation omitted).

Because the government may not assert qualified immunity in FTCA claims, this Court's previous reasons for limiting discovery are simply not implicated here.  *See, e.g., Castro v.*

24

*United States*,  34 F.3d 106, 111 (2d Cir. 1994) ("In a suit against the United States under the

FTCA, the United States is not entitled to defend on the basis of any official immunity that its

executive employees individually might possess."); *Farag v. United States*, 587 F. Supp.2d 436,

452 (E.D.N.Y., 2008) (the United States "may not assert qualified immunity as a defense to

plaintiffs' FTCA claim.").  Accordingly, plaintiff asks for the opportunity to conduct further

discovery before answering summary judgment on these claims.  In support of this request,

plaintiff offers his Second Amended Rule 56 affidavit.  (Exhibit F).

> **B.      Summary Judgment Should Be Denied As to Plaintiff's Malicious
> Prosecution Claim**

> **1.      The Proof Requirement for Malicious Prosecution Claims**

The tort of malicious criminal prosecution is designed to compensate the plaintiff "for the

damage to dignity and reputation caused by false accusation of a crime." *Trussell v. General*

*Motors Corp.*, 53 Ohio St.3d 142, 145-46, 559 N.E.2d 732, 734 - 735 (1990) (citations omitted).

The elements of malicious criminal prosecution are:  "(1) malice in instituting or continuing the

prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the

accused." *Id*.  Ohio law defines "malice" as "an improper purpose, or any purpose other than the

legitimate interest of bringing an offender to justice." *Elkins v. Summit County, Ohio*, No. 5:06-

CV-3004, 2009 WL 1150114, *10 (N.D. Oh., Apr. 28, 2009).  The essence of a malicious

prosecution action is the lack of probable cause "because malice may be inferred in the absence

of probable cause." *Pierson v. Aaron's Rental*, 2010 WL 4522425, *5 (Ohio App. 10 Dist.

2010); *See also Elkins*, 2009 WL 1150114 at *10.

For the purposes of this inquiry, probable cause is defined as "[a] reasonable ground of

suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious

man in the belief that the person accused is guilty of the offense with which he is charged." *Pierson*, 2010 WL 4522425 at *5 (internal quotations and citations omitted).  The question on summary judgment is whether there is a dispute of fact regarding whether the accuser had evidence "sufficient to justify an *honest belief* of the guilt of the accused."  *Krieger v. Cleveland Indians Baseball Co*., 176 Ohio App.3d 410, 435, 892 N.E.2d 461, 480 (Ohio App. 8 Dist. 2008) (emphasis in original, citation omitted), *rev'd on other grounds by Oliver v. Cleveland Indians Baseball Co. Ltd. Partnership*, 123 Ohio St.3d 278, 915 N.E.2d 1205 ( 2009).

When an indictment has been returned by the grand jury, the plaintiff can establish malicious prosecution by showing that "the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular."  *Id*., 176 Ohio App. 3d at 436, 915 N.E.2d at 480 (citation omitted); *see also Elkins*, 2009 WL 1150114 *10 -11 (denying summary judgment on malicious prosecution claim based on officers' suppression of *Brady* evidence); *Coleman v. Beachwood*, 2009 WL 3387948, *4 (Ohio App. 8 Dist.,2009) (fact issues regarding whether criminal complainant lied in her criminal complaint and at the underlying criminal trial precluded judgment on the pleadings in plaintiff's malicious prosecution action).

      **2.**      **Plaintiff Has Sufficient Evidence to Support These Claims**

          **a.**      **Lucas' False Testimony to the Grand Jury About Bray's Reliability as a Witness**

Evidence of Agent Lucas' false testimony to the Grand Jury, in order to secure Mr. Westerfield's indictment on the drug sale charges, creates a dispute of fact regarding the

malicious prosecution claim.[2]  Lucas' Grand Jury testimony on the drug sale charges relied exclusively on Bray's claims about his purported deals with Westerfield.  (Exhibit A, USA001-000018-20).  Lucas did not add any corroboration from himself or any officer, and, on information and belief, no other officer testified in support of these charges.  The investigation reports do not detail any effort by any law enforcement officer to corroborate Bray's accusations. In that context, a jury could certainly find malicious prosecution based on the theory that Lucas' false statements to the Grand Jury, in an effort to fraudulently bolster Bray's credibility and Mr. Westerfield's supposed culpability, caused Mr. Westerfield to be falsely arrested and prosecuted for those charges.

Dissecting Agent Lucas' testimony to the Grand Jury, virtually everything he stated to establish Bray's credibility as a source was knowingly false testimony.  Lucas testified that the officers' standard procedure was to corroborate Bray's allegations:  "[W]hen we made the controlled purchase, basically what we're doing is trying to corroborate the information from the informant."  (Exhibit A, USA001-000012).  However, this claim that the officers corroborated the informant was untrue on the most basic level.  *See, e.g.,* Doc. 133, ¶ 16; Doc. 135-1, ¶ 15 (Lucas and the other officers never bothered to confirm whether the addresses Bray attributed to suspects were actually tied to the alleged occupants, who were charged with crimes purportedly occurring at their home); Doc. 133, ¶ 18; Doc. 135-1, ¶ 18 (Lucas and the other officers did not document the fact that Bray routinely dialed the identical telephone numbers for unrelated

---

[2]  The government restricts its argument to whether there was probable cause for Count 30, the one non-Bray related charge, but ignores all of Lucas' false testimony and the manifest lack of probable cause for the charges relating to Westerfield's alleged drug sales to Bray and alleged participation in a drug conspiracy.

alleged suspects, called one suspect while claiming he called another, or had an entirely different phone encounter from the one recorded and/or detailed on the DEA-6 form); Doc. 133, ¶ 19; Doc. 135-1, ¶ 20 (Lucas and the other officers overlooked obvious discrepancies between the drug weights Bray claimed to transfer and the amounts he brought back to the officers, allowing Bray to steal drugs during the deals); Doc. 133, ¶ 30-31 (during one deal Lucas learned that the car the alleged dealer was driving was registered to Bray, and Lucas saw the driver return the car to Bray's house after the deal; Lucas altered the DEA-6 report to change the make of the car in order to hide this startling fact); Doc. 133, ¶¶ 22-27 (Lucas learned that an officer familiar with a suspect claimed that Bray falsely identified the suspect, but Lucas omitted this information from the report rather than following up on it).  In a nutshell, Lucas' testimony falsely informed the Grand Jury that Bray was a trustworthy informant because the officers were corroborating Bray's work when, in fact, they were turning a blind eye to his blatant ruses and false claims rather than corroborating even the most basic information.

Lucas next testified to the Grand Jury that as part of the officers' regular procedure, "We search the informant, make sure that the informant doesn't have any drugs or money.  We also search the informant's vehicle, to make sure the informant doesn't have any drugs or money." (Exhibit A, USA001-000012).  Along the same line, Lucas testified, "we recover the drugs, recover the recording device, search the informant and the vehicle again, to make sure they didn't pull a piece off for themselves, they didn't keep some of the buy money, pull a piece off. It is all to corroborate the informant." (Exhibit A, USA001-000013-14).  These statements were aimed at assuring the Grand Jury that the officers were making sure Bray was reliable and was not stealing drugs or money during the deals.  Such assurances recognize that if the Grand Jury

28

knew that Bray was stealing during his tenure as an informant, Bray's claims about the deals that occurred would never have been believed.

Lucas' assurances, however, were patently untrue given overwhelming evidence (which must be fully credited at this stage) establishing that Lucas knew Bray was stealing money and drugs while acting as an informant.  There is testimony in the record that Lucas was personally aware that Bray was regularly stealing money from the DEA during his purported drug deals. (Doc. 133, ¶ 13).   Additionally, the evidence shows that on one occasion Lucas learned from officers Verhiley and Ansari that Bray stole money during a drug buy, but Lucas falsified his DEA-6 report to hide the theft.  (Doc. 133 , ¶ 12).  During a proffer, one defendant revealed to Lucas that Bray was dealing his own drugs on the side, while conducting the controlled buys for the DEA, but Lucas' DEA-6 repot of the proffer omitted that revelation.  (Doc. 133 , ¶ 20). During one controlled buy, Bray stole drugs, hiding them in a secret compartment behind the wheel in his car.  (Doc. 135-1, ¶ 22-23).  Bray was arrested and charged with a fourth degree felony, possession of crack cocaine.  (*See* Exhibit D, Mansfield Mun. Ct. Records, *United States v. Bray*).  But Bray was never prosecuted for drug possession, the theft was never documented, and Bray was permitted to continue on as an informant.  (Doc. 135-1, ¶ 24-25).  With the exception of the proffer, all of these incidents occurred before Lucas' Grand Jury testimony. Thus, there is abundant evidence to create a dispute of fact about whether Lucas knew Bray was unreliable, but nevertheless misled the Grand Jury to convince it that Bray was a valid, trustworthy source.

Next, in describing how he knew Bray was a reliable source, Lucas told the Grand Jury, "We placed tape recorded telephone calls to these people. . . .We also made recordings of the

purchases." (Exhibit A, USA001-000012-13).  What Lucas did not reveal is that he never verified that the calls were to the person Bray claimed they were to, and often the calls were clearly not to the claimed recipient.  (Doc. 133 , ¶ 18).  Additionally, Bray was caught telling the officers that he paid a higher amount than the recording proved he paid and then hiding the balance in his car to keep for himself.  (Doc. 135-1, ¶ 26).  Bray's scheme to short the DEA thousands of dollars for one deal was revealed by a recording Lucas monitored, but Lucas assisted Bray with the cover-up rather than documenting the theft.  (Doc. 133 , ¶ 39).

In one recorded telephone call, a stand-in inadvertently referred to the person he was impersonating in the third person, but Lucas responded by altering the transcript of the call to hide the discrepancy.  (Doc. 133 , ¶ 45-47).  Lucas also overlooked and failed to document the fact that in one alleged deal, Bray failed to turn on his recording device until after the deal was completed.  (Doc. 133 , ¶ 67).  Lucas monitored the recording of another telephone call, purportedly between Bray and Ronald Davis.  After the call, in a recorded conversation, Bray told the Lucas he had spoken to Davis directly, but the telephone call recording showed Bray was speaking to a woman.  Despite Bray's claim that he spoke directly to Davis, Lucas' DEA-6 report changed the call recipient from Davis to a woman, so that the report would comport with the telephone recording.  (Doc. 133 , ¶ 78-81).  Accordingly, for Lucas to suggest to the Grand Jury that Bray was a reliable source based on verifications through the recordings was blatant misinformation.  There is ample evidence creating a clear dispute of fact about whether Lucas was again lying to the Grand Jury.

Finally, to falsely establish Bray's credibility, Lucas testified that he and the other officers routinely surveilled the purchases.  (Exhibit A, USA001-000013).  Again, this created

the false impression that Bray was trustworthy because the officers were watching to corroborate Bray's claims.  But nothing could be further from the truth.

Instead, not once, but twice, Lucas watched as Bray claimed that the same stand-in impersonator was two separate people during two separate transactions.  (Doc. 133 , ¶¶ 28, 42).  In two of those instances, the impersonator looked so little like the distinctive looking accused that the identification was truly preposterous.  (Doc. 133 , ¶¶ 23, 43).  Lucas has admitted that he testified falsely at the criminal trial, claiming that he witnessed one deal, when he could not actually see anything.  (Doc. 133 , ¶ 62).   In another criminal trial, Lucas falsely testified that he saw the accused with a gun, but at his own criminal trial admitted that this testimony was false.  (Doc. 133 , ¶ 87).   Lucas "never let Bray out of his sight" but did not report that Bray's girlfriend delivered drugs to him immediately before one deal (also captured on the recording device), and Bray then pretended he purchased those drugs in order to frame a victim.  (Doc. 133 , ¶ 63-66).  Again, construing the evidence in the light most favorable to plaintiff, there is a dispute of fact about whether Lucas was intentionally misleading the Grand Jury in order to create the false impression that if Bray said Westerfield sold him drugs, that should be sufficient to support an indictment.

With regards to the drug deals Mr. Westerfield allegedly participated in, Lucas' testimony to secure the indictment was extremely brief:  Lucas just summarized what Bray claimed occurred.  (Exhibit A, USA001-000018-20).  The bulk of Lucas' testimony went towards establishing Bray's reliability, so that Lucas' description of Bray's rendition would be enough to support an indictment.  There is sufficient evidence suggesting that all of Lucas' testimony about corroborating Bray was false.  A jury could easily conclude that had Lucas been

31

honest with the Grand Jury about Bray's constant lies and thefts, it never would have returned an

indictment based on Bray's claim that Mr. Westerfield sold him drugs, thus Lucas' false

testimony caused the prosecution.

> **b.**  **In Addition to Lucas' Lies Falsely Bolstering Bray's Credibility, the Evidence Supports a Reasonable Inference that Lucas Was Aware There Was No Probable Cause that Mr. Westerfield Committed the Drug Sales Alleged**

At the time of the drug sales allegedly between Bray and Mr. Westerfield, Westerfield

was wearing a non-removable GPS monitoring device administered through Adult Probation that

conclusively proved he was not present during the deals.  (Exhibit B at USA001-010890-940,

010856-57).  As early as March 2005, about eight months before Lucas' Grand Jury testimony,

the investigating officers reported that they were going to contact Adult Probation to corroborate

Bray's claim that Westerfield had been present for the deal.  (Exhibit B at USA001-010856-57).

Presumably, when they did so, the records showing Mr. Westerfield's position history for

the dates in question would have conclusively demonstrated that he was not present at either

alleged drug buy, as Bray had claimed, because Westerfield was not at the scene of the alleged

drug transactions at the time and dates in question.  (Exhibit B at USA001-010890-940).

Nevertheless, Lucas testified to the Grand Jury that Mr. Westerfield participated in these drug

sales without ever revealing the well-documented fact that Westerfield was wearing a GPS

monitor at the time.  (Exhibit A, USA001-000018-20; Exhibit B, USA001-010890-940, 10856-

57, 11491-514).  A jury could certainly infer from such evidence that Lucas was well aware that

Bray was lying about Westerfield's culpability.

Although Lucas was not involved in the Westerfield investigation at the time of the

supposed deals between Bray and Westerfield, a jury could reasonably infer that Lucas was

certainly privy to the GPS evidence by the time of his Grand Jury testimony.  Lucas was heavily

involved in the details of the case – he sat at the prosecution table through the entire trial and

testified to the Grand Jury about all of the alleged Bray transactions.  (Doc. 133 , ¶ 3; Exhibit A).

Given all of the evidence of Lucas' false reporting and false testimony to hide Bray's fake drug

deals, it is reasonable to infer that Lucas was again hiding exculpatory evidence.  *See, e.g.,* Doc.

133 , ¶ 11.

> ### c.  By Testifying About Other Allegations Bray Made, that Lucas Knew to Be False, Lucas Falsely Bolstered Bray's Credibility Before the Grand Jury

To deceptively make Bray appear like a reliable source, Lucas informed the Grand Jury,

"All these buys was the same confidential informant, the same source of information, CI,

whatever you want to call them.  He was the same person we used during all of this."  (Exhibit A

at USA001-000014).  Lucas then described the officers' standard protocol of corroborating Bray,

and enumerated the many drug dealers Bray had nabbed.  *See, e.g.,* Exhibit A, USA001-000017

(falsely informing the Grand Jury of the officers' supposed standard protocol:  "It is all the same,

search before, make a telephone before, follow, tape record, watch the meeting go down, follow

afterwards, recover the drugs.  There was a tape recording of each buy.").  By testifying about all

of these other deals, Lucas created the false impression that Bray had a proven track record.

But had Lucas revealed that Bray was caught lying in most of the other deals, the Grand

Jury never would have issued an indictment against Mr. Westerfield based on Bray's

accusations.  An egregious example of this is when Lucas testified to the Grand Jury:

> There was also a large crew . . . including Noel Mott, Arrico Spires, goes by Detroit
> Rico, Marlon Brooks, Lowestco Ballard, a lot of these guys are from Detroit.  They came
> in, basically set up shop.  They would drive up to Detroit, buy two or three kilos, come
> down, cook it up, sell it.  As soon as they had enough money to go back, they would go

reup and buy more.  We did a lot of surveillance.  Our informant was right in the middle.
He did, along with myself and my partner, did a lot of buys from these individuals.

Exhibit A, USA001-000016).  This testimony makes it sound like Bray was right in the thick of a

drug conspiracy, helping the officers nab a bunch of offenders.  But a jury could find that Lucas

knew virtually everything about this statement was false.

In fact, the one time that Lucas tried to verify what Bray said about drugs being run down

from Detroit, it turned out that Bray had either lied entirely or tipped off the offenders.

Specifically, on September 26, 2005, Bray told the officers that he was going to transport Noel

Mott to Detroit the next day to buy kilos of crack.  (Exhibit B, USA001-014353; Exhibit E,

Lucas testimony, at 3281).  In actuality, however, Bray set off for Detroit with his buddy Darren

Transou, each driving in a separate car, but caravanning.  (Exhibit C, Bray testimony, at 175-76).

Lucas arranged for troopers to stop both Bray and Mott and to seize the buy money.  (Exhibit E

at 3281-82).  But when the troopers stopped the two vehicles, they found Transou instead of

Mott (which they verified by Transou's driver's license), and they found no buy money at all.

(Exhibit E at 3282-83).  Thus, Lucas' only effort to corroborate Bray's claims about Mott

running drugs from Detroit revealed Bray's lies.  Moreover, during the deals attributed to Mott

and Ballard, Lucas saw Transou feebly impersonate both Mott and Ballard.  (Doc. 133, ¶¶ 42-

43).  For Lucas to turn around and enhance Bray's credibility by citing to the drug runs to

Detroit and the deals attributed to Mott and Ballard is beyond outrageous.

Lucas also falsely bolstered Bray's credibility by using the flawed deals with Joe Ward

(where Lucas was present when Bray's girlfriend brought the drugs that Bray pretended to buy

from Ward); Dwayne Nabors (where Metcalf has admitted that the identification was

perjurious); and Joshawa Webb (where Lucas actually sat in a car and conversed with the stand-

34

in and therefore presumably knew that the accused was not the same person (Doc. 133, ¶ 51).
(*See*, Lucas' Grand Jury testimony, Exhibit A at USA001-000027, 30-34, 37).  Thus, Lucas'
references to Bray's supposed proven track record in nabbing members of the fictional drug
conspiracy ring gave the Grand Jury the false impression that it could rely on Bray's accusations.

In sum, plaintiff has met the standard to proceed with this claim.  Crediting the evidence
and drawing reasonable inferences in his favor, as must be done at this stage, a jury could find
that Lucas simply did not have a reasonable, honest belief in Westerfield's guilt and that he
instead intentionally misled the Grand Jury.  Accordingly, summary judgment is not warranted.

### C.    Summary Judgment Should be Denied As to Plaintiff's Claims for Intentional Infliction of Emotional Distress

#### 1.    The Standards for Intentional Infliction of Emotional Distress Claims

To establish a claim for intentional infliction of emotional distress, a plaintiff must show
that:  1) the defendant intended to cause the plaintiff serious emotional distress; 2) the
defendant's conduct was extreme and outrageous; and 3) the defendant's conduct was the
proximate cause of plaintiff's serious emotional distress.  *Phung v. Waste Mgt., Inc*., 71 Ohio
St.3d 408, 410, 644 N.E.2d 286, 289 (1994).  Allegations that a defendant officer "maliciously
instituted criminal charges against [the plaintiff] without probable cause" and officer was
instrumental in charging plaintiff are sufficient to support a claim for intentional infliction of
emotional distress.  *See Pierce v. Woyma*, 2010 WL 4684722, *4 (Ohio App. 8 Dist. 2010).

Crediting plaintiff's evidence as true, as must be done at this stage, if Agent Lucas knew
full well that Bray was falsely framing Mr. Westerfield, but Lucas nevertheless lied and withheld
pivotal information when testifying before the Grand Jury, so as to secure Mr. Westerfield's
indictment for serious crimes that he did not commit, a jury could find that such conduct was

35

extreme and outrageous, intended to cause Mr. Westerfield serious emotional distress, and the proximate cause of Mr. Westerfield's emotional suffering.  *Id.*

### 2. There is Sufficient Evidence for a Jury to Find that Lucas Knew Bray was Framing Mr. Westerfield

As detailed above, the allegations that Mr. Westerfield sold drugs to Bray were based exclusively on Bray's rendition of events.  Although Bray claimed that the alleged sales involved both Tyrone Brown and Westerfield acting together, in Brown's proffer, he admitted his own culpability, but informed prosecutors that Mr. Westerfield was not involved.  (Exhibit B, USA001-010521).  There is sufficient evidence to create a dispute of fact about whether Lucas knew that Bray had simply invented Westerfield's presence.

A jury could reasonably infer that Lucas fabricated probable cause and withheld exonerating information from the Grand Jury, namely that Bray was framing innocent people left and right and that the non-removable GPS device that Mr. Westerfield wore at the time of the alleged transactions provided conclusive proof that he was not actually present for the deals as Bray alleged.  (Exhibit B, USA001-010890-940, 10856-57, 11491-514).

Lucas' obvious response to this allegation will likely be that he did not know about the GPS results contradicting Bray's allegations, but that denial merely creates a dispute of facts at this stage.  Plaintiff is entitled to all reasonable inferences in opposing summary judgment, and a jury could infer that Lucas is lying in light of:  (1) his repeated assurances to the Grand Jury that the officers were doing everything they could to corroborate Bray's allegations when that claim was manifestly false  (Exhibit A, USA001-000012, 14, 16; *supra* at 26-32, 33-35); (2) all of the information Lucas had about Bray framing innocent people for profit.  (*See supra* at 5-8).

Based on the egregious examples of Lucas lying and issuing false reports in order to

36

support Bray's phony identifications, a jury could easily conclude that Lucas is lying when he

says that he had no idea Mr. Westerfield was exonerated by GPS evidence.  Rather, a jury could

conclude that when Lucas testified that Bray was a reliable source and that the evidence

suggested there was probable cause that Westerfield sold drugs to Bray, Lucas was just lying.

> ### 3. The Evidence Creates an Issue of Material Fact About Whether Lucas' Testimony to the Grand Jury Was Outrageous, Intended to Cause Westerfield Emotional Distress, and Proximately Caused Such Distress

Crediting plaintiff's evidence, Lucas' lying to the Grand Jury to secure a false indictment

was outrageous and intended to cause emotional distress.  *See Pierce v. Woyma*, 2010 WL

4684722, *4 (Ohio App. 8 Dist. 2010).  As the evidence establishes that Lucas caused Mr.

Westerfield's indictment, a jury could conclude that he proximately caused Mr. Westerfield's

extreme distress.

### D. Summary Judgment Should be Denied on the Conspiracy Claim

The tort of civil conspiracy is "a malicious combination of two or more persons to injure

another in person or property, in a way not competent for one alone, resulting in actual

damages." *Williams v. Aetna Fin. Co*., 83 Ohio St.3d 464, 475, 700 N.E.2d 859, 868 (1998)

(citations and internal quotation marks omitted).  An underlying unlawful act is required before a

civil conspiracy claim can succeed.  *Id*.

The government's entire argument in support of summary judgment is that federal agents

had no involvement in Mr. Westerfield's investigation or arrest.  (Doc. 154-1 at 44-45).  This

ignores Agent Lucas' pivotal role in securing the indictment through false testimony to the

Grand Jury.  It also ignore this Court's finding that Lucas sat by silently while Metcalf (the

essential witness against Mr. Westerfield on Count 30) perjured himself during Mr.

Westerfield's criminal trial.  Finally, it ignores Agent Cross' role in Mr. Westerfield's arrest, his false reporting to hide Bray's unreliability, and his destruction of evidence.  (*See* Exhibit B, USA001-006870; Doc. 135-1, ¶¶ 11, 28-29, 60).  All of that conduct is sufficient to support liability theories and a conspiracy theory deriving therefrom.

As detailed above, Lucas' false testimony about Bray's supposed reliability and about all of the (fictional) efforts by DEA Agents and local law enforcement officers to corroborate Bray's allegations caused Mr. Westerfield's wrongful prosecution and severe emotional distress. This false testimony was part of a larger conspiracy among Bray, the involved DEA agents, and local law enforcement officers to hide Bray's wrongdoing, and the other officers were intimately involved.  For instance:  Detective Metcalf testified falsely to support Lucas' misrepresentations in one report; Lucas and Metcalf supported one another's perjury relating to the wrongful identification of a suspect; Lucas' reports hid Bray's attempted theft, while Detective Metcalf ensured that charges were dropped; and frequently Lucas changed transcripts to disguise what he and the other officers heard that disproved Bray's rendition of events.

Additionally, Agent Cross was intimately part of the conspiracy, drafting false reports to hide Bray's dishonesty and destroying evidence.  *See, e.g.,* Doc. 135-1, ¶ 11, 28-29, 60; *see also Mott v. Lucas, et al.*, 1:10-cv-00164, Doc. 69 (July 15, 2011, Pearson, J.) (denying Cross' motion for summary judgment based on qualified immunity for his role in this same frame-up conspiracy).

Defendant will undoubtedly point to Bray's testimony that he was a rogue frame-up artist and that Lucas and the other officers were uninvolved.  That testimony, however, is merely one piece of evidence.  Plaintiff has offered abundant evidence to counter the testimony, showing

38

that Lucas and his cohorts were aware of Bray's frame-up efforts and provided pivotal behind the scenes assistance.  Because this is defendant's motion for summary judgment, plaintiff is entitled to have his evidence credited and to have all reasonable inferences drawn on his behalf. He has presented more than enough evidence to create a dispute of fact on this issue, despite Bray and Lucas' denials.  Accordingly, summary judgment is not warranted.

**CONCLUSION**

There is sufficient evidence to create a dispute of fact about whether DEA Agent Lee Lucas lied to the Grand Jury in order to secure Jason Westerfield's indictment.  Perjury is not a discretionary function, and because Lucas is a federal agent, the intentional torts exception does not apply.  Plaintiff's claims for malicious prosecution, intentional infliction of emotional distress, and conspiracy are properly pled and supported by ample evidence.  Accordingly, neither dismissal nor summary judgment is appropriate.  Mr. Westerfield therefore respectfully asks the Court to deny the defendant's motion and allow this case to proceed to discovery.

Respectfully submitted,

/s/ Debra Loevy-Reyes

Jon Loevy
Aaron Mandel
Debra Loevy-Reyes
Loevy & Loevy
312 N. May Street, Ste. 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2011, I filed electronically a copy of the foregoing Plaintiff's Response to the United States' Motion to Dismiss, or Alternatively, Motion for Summary Judgment.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Any other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

s/ Debra Loevy-Reyes
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
Ph. – 312-243-5900
Fx. – 312-243-5902
debra@loevy.com